NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

PHILAMON LABORATORIES, INC.,
Respondent.

No. 122, Docket 27028.

United States Court of Appeals
Second Circuit.

Argued Dec. 6, 1961.

Decided Jan. 17, 1962.

William J. Avrutis, Attorney, National Labor Relations Board (Stuart Rothman, General Counsel, Dominick L. Manoli, Asso. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel and Samuel M. Singer, Attorney, National Labor Relations Board, on the brief), for petitioner.

Sanford H. Markham, New York City, for respondent.

Before MEDINA, SMITH and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge.

The National Labor Relations Board found respondent violated § 8(a) (1), (2) and (5) [1] of the National Labor Relations Act, as amended, and now petitions for enforcement of its order pursuant to § 10(e).[2] Having reviewed the record, including that portion which "fairly detracts" from the findings of the Board, we hold the findings are supported by substantial evidence and conclusive upon us. § 10(e); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Because the remedy sought is appropriate, we grant the petition.

Respondent maintains a plant in Westbury, New York, and is engaged in the manufacture, sale and distribution of electronic products. The parties have stipulated as to the appropriate bargaining unit. As a result of dissatisfaction arising primarily from respondent's indifference to employee grievances, the operation of the existing profit-sharing plan, wages, and the lack of sick-leave provisions, some sixteen employees signed applications and bargaining authorizations for Local 868, International Brotherhood of Teamsters by August 5, 1959. There were then twenty-nine employees in the unit. On Thursday, August 6, respondent received a telegram from the union claiming to represent "the majority of your employees" and requesting an early appointment for purposes of negotiating a collective agreement. Respondent made no reply. On August 7, Bruckner, Local 868's business repre-

1. 29 U.S.C.A. § 158(a) (1), (2), and (5).  2. 29 U.S.C.A. § 160(e).

sentative, telephoned respondent and asked to speak to its president, Grib. After being informed Grib could not be disturbed at that time, Bruckner left his name and requested that Grib call back. Grib failed to do so. On Monday, August 10, Bruckner and another representative of Local 868 went to the plant and asked to see Grib. They were informed that Grib had gone on vacation. Shinerer, the plant manager, told them Grib was expected back on Thursday or Friday. Shinerer said he would be in touch with Grib during the week and if they would call him, Shinerer, on Wednesday, the 12th, an appointment would be arranged for later in the week.

The same day, August 10, the union received two more authorizations, making a total of eighteen, and filed an election petition with the Board. Respondent received a letter from the Board's Regional Director concerning this before 3:00 P. M., on Thursday, August 13. On Wednesday, the 12th, Bruckner called Shinerer at the plant and was told he was gone for the day but would be in the next morning. Bruckner called the next morning, Thursday, and was told Shinerer was not in but was expected about 10:00 A.M. Bruckner asked that Shinerer return the call. Not having received a return call, Bruckner called the plant again at 4:00 P.M. He was told Shinerer was in conference and could not be disturbed, but would call Bruckner back. He did not.

Bruckner and the other representative went to the plant again the next morning, August 14, at 9:30 A.M. They asked to see Grib and, after being informed he was not in, talked to Shinerer. The latter told them to call back at noon. When asked what time he went to lunch, Shinerer replied, "I never go out." Bruckner expressed a desire for a negotiated recognition without an election and offered to show the authorization cards to an impartial person such as the neighborhood rabbi, priest or minister. Shinerer stated the decision was for Grib to make. Between 1 and 1:30, Bruckner called the plant and was told everyone was in conference but that he should call back in an hour. Between 2:15 and 2:20 p. m., he called back, asking for Shinerer or Grib and was told they were out to lunch. Having been assured by the operator that they were receiving his messages Bruckner asked that they call him back. They never did.

Although Grib had been indifferent to the employees' grievances for many months, he underwent a marked change of attitude upon his return to the plant on August 13. Anne Dee, a vigorously anti-union employee, requested that he call a meeting of all employees to discuss the union situation. Although Grib was wholly inaccessible to the union and doggedly avoided any contact with it, he immediately adopted Dee's suggestion. The meeting, which lasted an hour, was held that day on company time. Grib told the employees of the Teamsters' claims and of the election petition. He then asked for comments, and several employees spoke. As for the wage issue, Grig stated there had been a raise "in the fire" for a few months which would be granted whether or not there was a union. He made no comment upon the profit-sharing plan but said he was against sick leave. He further stated that his lieutenants had let him down in not letting grievances get through to him.

The next day, Friday, August 14, a committee of employees, apparently led by Anne Dee and purporting to speak for those not present, asked to see Grib. They were admitted to his office within ten minutes. Grib repeated his earlier statement as to a pay raise and assured them they were going to get it. He also stated he was willing to do away with profit-sharing plan and increase regular wages by a corresponding amount. The committee suggested a particular sick leave plan, and Grib indicated he would look favorably upon it although he desired time to think it over. He also told the employees they "would get a better deal if [they] * * * passed the union by." At one or both of these meetings, Grib suggested the employees form their own committee to present such issues and

indicated his willingness to deal with such a group. Immediately after this conference, the employees held a meeting of their own, and one Cotrufo related what had occurred in Grib's office and suggested the formation of a committee to negotiate with Grib.[3] Ultimately, this occurred, but the committee has since been inactive. At all times, Grib assured the employees they could have the Teamsters if they so desired. After work that day, two employees, representing the rest, went to Bruckner and asked the union to hold off for sixty days to see if Grib lived up to his promises.

On Monday, August 17, Shinerer polled the employees as to whether they wished to abolish the profit-sharing plan. A majority said they did. Beginning with the wages of that week, each employee received an increase of ten cents an hour and were told the additional amount represented the conversion of the profit-sharing plan to cash payments. Grib also questioned employee Trockel on the 17th. After describing what had occurred on Friday when Trockel was absent, Grib asked him what he thought about it. Trockel indicated he would go along with the majority, and Grib said he and another employee who had been union adherents did not have to worry about a "witch-hunt." On September 25, respondent instituted a sick-leave plan in accordance with the employees' proposal. On November 1, the general wage increase promised was instituted.

The union's charge was filed on August 21, and the regional director approved the withdrawal of the election petition on August 24. On the basis of the findings above, the Board concluded respondent had violated §§ 8(a) (1), (2) and (5) of the Act. The order directs respondent to recognize and bargain in good faith with Local 868, and to cease and desist from engaging in certain other unlawful conduct.

### The § 8(a) (5) Violation [4]

■ The act imposes a duty to bargain in good faith upon request whenever a labor organization has been designated by a majority of employees in an appropriate bargaining unit. The employer must recognize and bargain with such an organization whether or not it has been certified by the Labor Board. United Mine Workers of America v. Arkansas Oak Flooring Co., 351 U.S. 62, 76 S.Ct. 559, 100 L.Ed. 941 (1956); N. L. R. B. v. Sunrise Lumber & Trim Corp., 241 F.2d 620 (2 Cir., 1957), cert. denied 355 U.S. 818, 78 S.Ct. 22, 2 L.Ed.2d 34 (1957). To be sure, an employer laboring under a good faith doubt as to a union's majority status need not extend recognition. Nevertheless, in the absence of such a doubt, the employer has no vested right to an election. N. L. R. B. v. Trimfit of California, 211 F.2d 206 (9 Cir., 1954).

■ Respondent contends the union in fact did not have a majority because three designation cards were either invalid or not proven genuine. These contentions are baseless. Employee LaDisa testified he was told he would have no friends in the shop if he told his aunt, Anne Dee, that he had signed a card. This is hardly sufficient to indicate his bargaining authorization was coerced. Employee Manno was told on August 4 that a majority of the employees "wanted" a union, even though a majority had not signed designation cards by that date. Manno's testimony indicates he agreed with that estimate of the situation, and there is no evidence to show such was not the case. No representation was made that a majority had actually signed up. These circumstances distinguish the pres-

---

3. Cotrufo was an assistant foreman and in fact acting foreman that day. Nevertheless, the trial examiner found the speech could not be attributed to respondent. We accept that finding.

4. Section 8(a) (5) reads in part:
    "§ 8(a) It shall be an unfair labor practice for an employer—
    \*     \*     \*     \*     \*
    "(5) to refuse to bargain collectively with the representatives of his employees \* \* \*".

ent case from N. L. R. B. v. H. Rohtstein & Co., 266 F.2d 407 (1 Cir., 1959) where a representation that a majority had signed up was shown to be false. The third card, allegedly signed by employee King, was admitted into evidence without testimony as to its authenticity. The trial examiner found, however, the signature matched a concededly genuine signature of King. In the absence of any showing to the contrary, this is sufficient to support a finding of authenticity. See 28 U.S.C. § 1731.

■ Respondent asserts the union's request for bargaining was defective because it failed to specify a particular bargaining unit but referred only generally to "your employees." Respondent knew, however, of the unit involved by means of the Regional Director's letter which was received before the August 13 meeting. Moreover, respondent's conduct was hardly prompted by uncertainty over the bargaining unit. It never sought to clarify this matter, or any other, with the union, and the nature and size of respondent's operations are not such as to create complicated unit problems. In view of Grib's conduct in negotiating directly with the employees involved, the fairer inference would seem to be that he knew exactly what group the union was talking about.

■ Finally, respondent contends it had a good faith doubt as to the union's majority status. The record shows, however, that respondent in fact deliberately shut its eyes to the facts of its industrial life and assiduously avoided giving the union any opportunity to substantiate its claims. Such conduct is not indicative of good faith. Respondent in fact withheld recognition merely to gain time to dissipate the very majority which it now con-

tends was in doubt. See N. L. R. B. v. Epstein, 203 F.2d 482 (3 Cir., 1953), cert. denied 347 U.S. 912, 74 S.Ct. 474, 98 L. Ed. 1068 (1954). Nor is respondent's alleged lack of an anti-union bias a defense. A refusal to bargain with a union designated by a majority and promises of benefit employed as inducements to leave the union violate the Act. Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944). The fact that such conduct is accompanied by assurances of free choice does not remove it from the ambit of the statute when the record as a whole demonstrates the unlawful purpose. Joy Silk Mills v. N. L. R. B., 185 F.2d 732, 87 U.S.App. D.C. 360 (1950); N. L. R. B. v. Stow Manufacturing Co., 217 F.2d 900 (2 Cir., 1954), cert. denied 348 U.S. 964, 75 S.Ct. 524, 99 L.Ed. 751 (1955). The record before us convincingly demonstrates that purpose.

### The 8(a) (1) Violation [5]

■ The Board found that Grib's promises to the employees on August 13 and 14 (and to employee Trockel on August 17), and their subsequent fulfillment, were violations of § 8(a) (1). Promises of benefit designed to induce disaffection from a union violate that section. Medo Photo Supply Corp. v. N. L. R. B., supra; Joy Silk Mills v. N. L. R. B., supra. The context surrounding Grib's conduct indicates such a purpose. The employees were all aware of the union's demand for recognition, and Grib's sudden concern for their grievances, in contrast to his previous indifference, had an unmistakable meaning for them. While he assiduously avoided all contact with union representatives, he was more than willing to bargain directly with the employees. Indeed, he was quite anxious

5. Section 8(a) (1) reads:
   "§ 8(a) It shall be an unfair labor practice for an employer—
   "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 of this title."

Section 7 provides in part:
   "§ 7—Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. * * *"

to discover why the employees wanted a union, or, to put it another way, how much it would cost him to get rid of the union. Having learned the price, he then met it. He assured the employees that better procedures for processing grievances would be worked out, that he would deal with an employee committee, that a pay raise which had been "in the fire" but was theretofore unannounced would be granted, that desired changes in the profit-sharing plan would be made, and that the sick-leave plan proposed by the employees would be given favorable consideration.[6] Much of this was repeated in the individual interrogation of Trockel on Monday.[7] Moreover, while he was making the promises in question, Grib told the employees they would get a "better deal" by forgetting the union. The clear implication of the timing and context of these events was that the employees would receive the promised benefits if they abandoned the union.[8] The net result of Grib's conduct was a request to the union by the employees that it hold off for sixty days so they might see whether Grib lived up to his promises. The Board's conclusion that Grib intended and desired such a result is supported by substantial evidence and binding upon us.

### The § 8(a) (2) Violation[9]

 On August 14, respondent openly negotiated with a hastily assembled committee of employees. This was done even though the union had bargaining authorizations from a majority of employees and had requested recognition. Grib further suggested to the employees the formation of a standing "grievance committee" to negotiate with him at future times over matters similar to those which had caused the dissatisfaction. The committee was designed to be a labor organization within the meaning of § 2(5) of the Act. Cf. N. L. R. B. v. Cabot Carbon Co., 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175 (1959). Ultimately, it was formed but was inactive. There can be no question but that respondent gave support and assistance to the August 14 committee. Grib negotiated with it even though he was bound by law to recognize Local 868. He also suggested the formation of the standing committee and assured the employees of his willingness to deal with it. When members were finally chosen, two supervisory employees were present at the selection. These activities constitute unlawful support within § 8(a) (2). See International Association of Machinists, Lodge No. 35 v. N. L. R. B., 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50 (1940); N. L. R. B. v. Stow Manufacturing Co., supra.

### The Remedy

[11] The Board has ordered, *inter alia,* that respondent recognize and bargain in good faith with Local 868. Respondent asserts, however, that only six of the original eighteen union adherents remain in the bargaining unit. On this basis, it is argued, the appropriate remedy is not recognition but an election. Respondent relies in particular upon our

6. Respondent has emphasized the fact that Grib repeatedly stated the raise had been "in the fire" for months. The Board, however, relied on the timing of the announcement and the context in which it was made. We agree with the Board that under the circumstances of this case, the fact that respondent may have had the raise in mind before the organizational activity is not of great significance.

7. We do not pause to decide whether this interrogation, viewed in isolation, violates the Act. The Board order prohibiting further interrogations in the context of these unfair labor practices is not improper. Cf. N. L. R. B. v. Firedoor

Corp. of America, 291 F.2d 328, 331–332 (2 Cir.1961).

8. Respondent's reliance upon § 8(c), the "free speech" provision, is misplaced. That section explicitly denies protection to speech containing a "promise of benefit."

9. Section 8(a) (2) provides in part:
"§ 8(a)—It shall be an unfair labor practice for an employer—
\*  \*  \*  \*  \*

"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it \* \* \*."

decisions in N. L. R. B. v. Adhesive Products Corp., 281 F.2d 89 (2 Cir., 1960); N. L. R. B. v. Marcus Trucking Co., 286 F.2d 583 (2 Cir., 1961); and N. L. R. B. v. Superior Fireproof Door & Sash Co., 289 F.2d 713 (2 Cir., 1961).

In Adhesive Products we directed an election because the employees' initial choice was made in an atmosphere which did not allow "opportunity of giving the matter due and proper reflection and consideration." In Marcus Trucking, the employer had recognized a majority union in violation of its obligations under the Board's contract bar rules. No element indicating employer interference with employee free choice was present, however, for the contract bar rules themselves are intended to allow considerations relating to stability to govern over employee choice in certain circumstances.[10] In Superior, an election was directed because of an "inordinate delay" in the Board's proceedings and because the union had abandoned the employees for six months after certification and had not represented them for nearly four years.

The present case, however, does not involve such special considerations. The sole circumstance advanced by respondent to support its contention is that in the process of normal personnel turnover many original union adherents have left its employ. While respondent's argument is appealing in some aspects, we do not believe this is a case in which the Board has applied "a remedy it has worked out on the basis of its experience, without regard to circumstances which may make its application to a particular situation oppressive and therefore not calculated to effectuate a policy of the Act." N. L. R. B. v. Seven-Up Bottling

Co., 344 U.S. 344, 349, 73 S.Ct. 287, 290, 97 L.Ed. 377 (1953).

In Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944), the Supreme Court rejected the argument pressed here with the statement, "That the Board was within its statutory authority in adopting the remedy which it has adopted * * * seems too plain for anything but statement. * * *" 321 U.S. at 705, 64 S.Ct. at 819. Over seventeen years have passed since that decision, and the National Labor Relations Act has twice undergone searching Congressional revision in light of past experience. That decision, however, has not been upset, and the presumption of Congressional approval is strong indeed. N. L. R. B. v. Gullett Gin Co., 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951). We followed Frank Bros. in N. L. R. B. v. Stow Manufacturing Co., supra, and enforced a Board order compelling recognition without an intervening election. The rationale was premised on the Board's expert conclusion that the employer's illegal conduct had turned the employees against the union even though there was not, in the language of Judge Learned Hand, "the proverbial scintilla to justify the * * * conclusion." We find the present case even stronger, however, for after the meetings on August 13 and 14, the employees asked the union to hold off for sixty days to see if Grib lived up to his promises. It is clear, therefore, the unfair labor practices here did in fact cause the union's loss of a majority.[11]

Even without such established precedents, we would be hard pressed to reject this exercise of the Board's remedial powers. The union lost majority status because of respondent's violations of the

10. These rules prohibit recognition of a majority union by an employer for a certain length of time when he is bound by contract to another union which he validly recognized but which subsequently lost its majority.

11. Respondent seeks to distinguish Frank Bros. on the grounds the employer in that case conducted "an aggressive campaign against the union." That factor, however, is relevant only to the issue of whether the employer's refusal to bargain and/or ancillary violations caused the union's loss of majority status. In light of the record and findings before us, therefore, Frank Bros. is not distinguishable.

law. The only effective remedy left in the present case is the requiring of recognition. And, indeed, as far as future cases are concerned, a denial of power to the Board here might well encourage employers to refuse to bargain, commit the ancillary violations, fight the unfair labor practice charges to the courts, and then rely upon the inevitable intervening turnover in personnel to ward off the only effective remedy remaining. In any case, we cannot say such a rationale may not be adopted and applied by the specialized agency entrusted by Congress with the principal enforcement duties under the Act.

Enforcement granted.