**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ECONOMY FOOD CENTER, INC., Respondent.**

**No. 14370.**

United States Court of Appeals Seventh Circuit.

May 22, 1964.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Lee M. Modjeska, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Leo McGuire, Atty., N. L. R. B., for petitioner.

Harry P. Dees, Evansville, Ind., Arthur R. Donovan, Joseph A. Yocum, Evansville, Ind., for respondent, Economy Food Center, Inc.; Kahn, Dees, Donovan & Kahn, Evansville, Ind., of counsel.

Before DUFFY, KNOCH and KILEY, Circuit Judges.

KILEY, Circuit Judge.

The National Labor Relations Board adopted the findings and recommendations of the Trial Examiner, and here seeks enforcement of its order [1] requiring the Economy Food Center, Inc.[2] to cease and desist from unfair labor practices and to make an unlawfully discharged employee whole for lost wages.

The issue is whether there is substantial evidence in the record as a whole to justify the Board in finding: (1) that the Company violated § 8(a) (1) of the Act [3] by coercing, interfering with and restraining its employees in their right to self-organization guaranteed by § 7; (2) that the Company violated §§ 8(a) (3) and 8(a) (1) by unlawfully discharging an employee for Union activity; and (3) that the Company refused to recognize, and bargain with, the Union [4] in good faith in violation of §§ 8(a) (5)

1. The Board's Decision and Order are reported at 142 N.L.R.B. 901 (1963).

2. An Indiana corporation which operates five supermarkets in Evansville, Indiana.

3. The National Labor Relations Act, as amended, 29 U.S.C. §§ 151 et seq.

4. Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO, District Union No. 99.

and 8(a) (1). We think the findings are justified and the order should be enforced.

The Board found that the Company violated § 8(a) (1) of the Act through the following threats, during the Union organizational drive, of Personnel Manager Schroer: to Augustine, in the presence of other employees, that he, Augustine, knew how the Company felt about unions, and that employees at Bedford-Nugent [5] had lost time because of strikes and "we wouldn't want that to happen to us;" to Barton, that employees had better think it over or be unemployed if the Union "got in" because the president couldn't pay the wages the Union would set up and would sell the Company; to Henrietta English, that the president would sell the Company before he would let the Union in; and to Welch, that he knew a "fellow that was about 50 years old" who went out on strike at Bedford-Nugent and that all the "old man" could do now was walk a picket line and that if the Union got in "more than likely we would all be out of a job."

█ The Board found further violations of § 8(a) (1) through the following inquiries by Company supervisors which amounted to "unlawful interrogation": Schroer's inquiry if Augustine had heard of any Union activities and if the employees had told him they had been contacted; and Store Manager Nunn's questions to employee Thiry whether a Union representative had visited him in his home, and later, if the Union man had returned.

██ We think the Board could reasonably adopt the Examiner's crediting of the employees in what conflicts there were between their testimony and that of Schroer and Nunn. The Examiner was not required to infer that Nunn's inquiry was a "spontaneous response" as in N. L. R. B. v. Larry Faul Oldsmobile Co.,

316 F.2d 595 (7th Cir. 1963), or that the Company was, after demand for Union recognition, merely inquiring into employee interest or checking the extent of the Union activity. He was not required to infer that Schroer's conversation of the "old man" at Bedford-Nugent was a mere expression of opinion as that of president Bilton in Bilton Insulation, Inc. v. N. L. R. B., 297 F.2d 141, 143 (4th Cir. 1961). Finally, the Examiner did not think there were merely five "isolated instances" and we are not disposed, in our view of the testimony, to disagree with his and the Board's view. The facts here are far different from those in John S. Barnes Corp. v. N. L. R. B., 190 F.2d 127, 130–131 (7th Cir. 1951). We think the Board did not err in concluding that this conduct of the Company violated § 8-(a) (1).

On the alleged unlawful discharge of Barton, the question for the Trial Examiner was the Company's motive: whether it was for delinquency in his duty as a meat-cutter on September 19, 1962, or for his activities as one of the two employee-instigators of the Union movement in the summer of 1962.

Barton worked for the Company as a relief meat-cutter for two years prior to his discharge. Gaining an excellent reputation [6] he was made a regular meat-cutter on September 1, 1962 at the Fairlawn Store. On September 19 he worked from 8 a. m. to 8 p. m. His department head did not work that day, and the assistant department head left at 4:30 p. m. Shortly thereafter, the store manager told Barton to fill up the meat counter and remove "dark" cuts of meat. When the order was not complied with in "45 minutes" the manager recommended Barton be fired. The next day he was discharged "because of his capability and he just didn't get along with the other people in the department."

---

5. A local company whose labor problems and strikes were publicized by the local newspapers at the time of this organizational drive.

6. The Company adduced several complaints about Barton, but the Trial Examiner found these were "trivial and stale" on the date of the discharge and could "hardly be said to have motivated the drastic act of discharge."

[4] We think the record as a whole supports the inference that Barton was discharged for his known [7] Union activities and not for the incident on September 19. His lack of "capability" on September 19, eight days after the Regional Director's direction of an election, is hardly consistent with Schroer's praise of him to the store manager on September 1 as an "experienced" meat cutter or his praise of him two months earlier for his "excellent job." The disobeyed order on September 19, expressly blaming Barton for the "dark" meat [8] could strike the Examiner as a "mere pretext to cloak the true ground for his discharge," in an antiunion atmosphere in which employees' rights were being violated. We conclude that even though the Examiner had "no doubt" a valid ground for Barton's discharge existed, the Board was justified, on substantial evidence, in deciding that the Company committed an unfair labor practice by discharging Barton for his Union activities. N. L. R. B. v. Howe Scale Co., 311 F.2d 502, 505 (7th Cir. 1963).

On August 2, 1962, the Union requested the Company to recognize and bargain with it, as representative of a majority of its employees in its meat departments, which the Regional Director later determined to be an appropriate unit. The Company argues that the record as a whole does not support a finding that the Union represented a majority of the meat department employees when the Union requested recognition. It challenges seven of the 22 union authorization cards signed by the employees in the 38 employee unit: one card, because, it says, it was signed by a part-time employee "not properly included" in the unit; two others, because, it claims, they were "signed as a result of Union threats;" two, because their authenticity is not supported by substantial evidence; and two more, because, it says, the employees' signatures "were purchased" by the Union's promise to waive its $75.00 initiation fee. We think that at least five of these cards were properly counted for the Union.

The part-time employee here is not merely "extra Saturday help" as in Canadian Fur Trappers Corp., 4 N.L.R. B. 904, 908 (1938), but is a "regular part-time employee" who does work "similar to that done by full-time employees in the unit," and has a community of interest strong enough in relation to regular, full-time employees to properly warrant her inclusion in the bargaining unit. V. I. P. Radio, Inc., 128 N.L.R.B. 113, 116 (1960), Southern Illinois Sand Co., 137 N.L.R.B. 1490, 1492 (1962). It follows that her card was properly counted.

The finding that employee English was not threatened, by the Union, into signing the card is not clearly erroneous. And the Examiner, who saw and heard the witnesses, was not bound to infer from employee Dillon's "equivocal" testimony that she was threatened into signing the card. Their cards were properly counted.

The signatures on the cards of the two employees absent at the time of the hearing were authenticated by Union representative Goss, who testified that both cards were signed in his presence and that he witnessed each signature. In view of the fact that no reason appears in the record to preclude acceptance of Goss' testimony as determining the authenticity of the cards, we cannot say the finding of the Board was not justified, N. L. R. B. v. Sunshine Mining Co., 110 F.2d 780, 790 (9th Cir. 1940), cert. denied, 312 U.S. 678, 61 S.Ct. 447, 85 L.Ed. 1118 (1941), and these cards were also properly included.

These conclusions confirm the Union's majority status (20 of 38), and we need go no further for our decision that the finding of the Board, that the

---

7. We see no reason to upset the Trial Examiner's finding that the Company was aware of Barton's Union sympathy and activities.

8. The store manager testified it takes "as much as three days" for meat to become "dark."

Union represented a majority of the employees in the meat department at the time it requested recognition, is not clearly erroneous.

The Board found that "Respondent's refusal to recognize the Union was not based on a good faith doubt as to the appropriateness of the unit sought or the Union's majority status therein," and concluded the refusal was violative of §§ 8(a) (5) and 8(a) (1).

The finding was based on the facts that the question as to the appropriateness of the unit—the meat department employees—was not raised when the request for recognition was made; and that the Company made no effort to ascertain whether the Union in fact possessed a majority status, refusing to entrust the card check to the Indiana Secretary of Labor, as suggested by Goss, but not proposing a check by any other party; and on the Company's explanation of its "good faith doubt" position—"We just felt we had a real loyal organization, and they were all happy." The Board concluded that since the Company made no attempt to learn the facts and "deliberately shut its eyes to the facts * * and assiduously avoided giving the union any real opportunity to substantiate its claims," its conduct was not indicative of good faith. N. L. R. B. v. Philamon Labs., Inc., 298 F.2d 176, 180 (2d Cir. 1962), cert. denied, 370 U.S. 919, 82 S.Ct. 1555, 8 L.Ed.2d 498. "Good-faith doubt would have dictated immediate response stating candidly the Respondent's position." N. L. R. B. v. Howe Scale Co., 311 F.2d 502, 505 (7th Cir. 1963). The existence of a good faith doubt, in light of all the circumstances, raises mainly a question of credibility, N. L. R. B. v. Crean, 326 F.2d 391 (7th Cir. 1964), and even assuming the validity of the factors advanced by the Company that "could" prove its "good faith doubt," we cannot say the Board erred.

In addition to the Company's lack of candor, N. L. R. B. v. Howe Scale Co., 311 F.2d 502, 505 (7th Cir. 1963), and in view of the Company's conduct found by the Board—with respect to in-terference and coercion of employees in the Union organizational period, the discharge of Barton for Union activity, and the specious challenges of employee cards while indifferent to any checking of the cards—we think the "good faith doubt" defense is refuted by the record as a whole. N. L. R. B. v. Overnite Transp. Co., 308 F.2d 279, 283 (4th Cir. 1962), and that the conclusion of the Board is not erroneous.

For the reasons given, the order will be enforced.