**The COLSON CORPORATION,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 17820.

United States Court of Appeals
Eighth Circuit.

June 14, 1965.

Rehearing Denied July 9, 1965.

James E. Reeves, Caruthersville, Mo., for petitioner.

Gary Green, Atty., N.L.R.B., Washington, D. C., made argument for respondent and filed brief with Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B. and Paul M. Thompson, Atty., N.L.R.B., Washington, D. C.

Before VOGEL and BLACKMUN, Circuit Judges, and REGISTER, District Judge.

VOGEL, Circuit Judge.

This case is here on the petition of The Colson Corporation, Caruthersville, Missouri, (hereinafter called petitioner) to review and set aside a final order of the National Labor Relations Board dated September 4, 1964, as amended September 15, 1964, issued pursuant to § 10(c) of the National Labor Relations Act as amended (61 Stat. 136, 73 Stat. 519, 29 U.S.C.A. § 151 et seq.) finding petitioner guilty of unfair labor practices in violation of §§ 8(a) (1) and 8(a) (5) of said Act (29 U.S.C.A. §§ 158(a) (1) and 158 (a) (5)). In its answer to the petition the Board requested that its order be enforced. The Board's decision and order are reported at 148 N.L.R.B. No. 89.

The Board found that petitioner violated § 8(a) (1) of the Act by coercively interrogating employees, by threatening them with reprisal if they supported the Union, and by enlisting them to report on the union activities of other employees. The Board also found that petitioner violated § 8(a) (5) and § 8(a) (1) of the Act by refusing to recognize and bargain with the Union on and after January 8, 1963, and, additionally, by unilaterally granting wage increases on March 27 and December 16, 1963. The Board further found that petitioner violated § 8(a) (1) of the Act by refusing to reemploy employees White, Davidson, Harwell and Pruitt because they had engaged in protected concerted activities.

Petition is an Ohio corporation with manufacturing facilities in Missouri, Arkansas and Massachusetts. The only plant involved in the present dispute is at Caruthersville, Missouri. The products manufactured involve materials handling and hospital equipment. There is no dispute about the fact that petitioner is engaged in commerce within the meaning of the Act. The labor organization which is the charging party in these proceedings is the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL-CIO (hereinafter called the Union). It is also undisputed that this labor organization comes within the terms of the Act.

The Board found: The citizens of Caruthersville, Missouri, had become aware of the economic benefits attendant upon industry being brought to their city and as a consequence they formed an organization called the Caruthersville Industrial Development Corporation (herein CIDC) to further their efforts. The president of CIDC was a Mr. Gordon Wright. Horace Dunagan, president of the local bank, served as vice president, and other CIDC stockholders were members of the local business community. The CIDC entered into negotiations with The Colson Corporation and, pursuant to these negotiations, another corporation was formed in 1962, called the R & R Corporation.

The R & R Corporation was initially incorporated for the minimum allowable capital under Missouri law of $500, such sum being furnished by CIDC. The president of R & R was also Gordon Wright and the vice president Horace Dunagan. It was stipulated that the purpose of the R & R Corporation was two-

**132**

fold: First, to keep the name of Colson out of the picture with regard to negotiations with the City of Caruthersville; and, second, The Colson Corporation had under advisement a plan to close a plant in Ohio and wished no publicity as to their move.

The City of Caruthersville erected the plant facilities in 1962 and presently owns them. Through a complex arrangement, for the reasons above stated, R & R, on behalf of The Colson Corporation, negotiated a lease with the City. Construction of the plant in Caruthersville began in June 1962. A few employees started to work in July, but the plant was not fully open for business until September 17th, when it went into production. Throughout the construction and early production period, George A. Jones, Colson's vice president in charge of manufacturing, was present at the site, along with several other key personnel for Colson. Payroll checks and other administrative expenses for the plant were paid for by R & R until mid-September. During this period, new employees were informed that they were working for R & R and, upon being hired, were given a book of work rules which referred to their employer as R & R Fabricators, Inc. R & R Corporation was reimbursed by petitioner for these expenditures. The management during this interim period of time and at all times at the plant were considered Colson personnel. It was stipulated that none of the officers or directors of the R & R Corporation had any management functions and all served without pay. On November 30, 1962, all the officers and directors of R & R Corporation resigned and the shares which they held were transferred to some of the officers of Colson. There was no public announcement, however, of this change. CIDC was reimbursed by Colson for its initial investment of $500 in R & R Corporation. Colson directed that the R & R Corporation be liquidated, and this was being carried out at the time of the hearing. Also, the lease between R & R Corporation and the City was cancelled and a new lease entered into between petitioner and the City of Caruthersville.

In late December of 1962 and early January 1963, the Union engaged in an intensive organizational campaign among petitioner's employees. William Sheffield, petitioner's plant manager, was informed by telegram, sent on January 3rd and received January 4th, of this unionization effort and was also informed by the same means that employees Odell Thornton, Harlin Crayne, Herman Goodwin, Ralph Elkins and Herman Miller were acting as members of the organizational committee. By January 8, 1963, the Union had obtained 30 authorization cards in a unit conceded by petitioner to be appropriate. It was stipulated that there were 57 persons within this appropriate bargaining unit. On January 8th Union representatives went to petitioner's plant and talked to Mr. Sheffield. While there they handed him a letter signed by a Union representative which stated that the Union represented a majority of petitioner's employees, requested recognition and offered to submit the authorization cards to a neutral third party for checking. The request was orally denied by Mr. Sheffield on the 8th, and was formally denied by letter dated January 14, 1963.

On January 4, 1963, the date petitioner received the telegram informing it of a union campaign, a meeting called by the Mayor was held at City Hall in Caruthersville, attended by approximately 25 businessmen of the city. At this meeting it was agreed that the businessmen would contact the employees to persuade them not to vote for the Union.

On January 10, 1963, the Union filed a representation petition accompanied by 32 authorization cards. On January 28, 1963, the Union filed an unfair labor practice charge against the company, alleging that the conduct of the businessmen in Caruthersville in contacting the employees of petitioner was a violation of § 8(a) (1) of the Act. A similar charge was made against some of Colson's supervisory personnel. On February 27, 1963,

the Union withdrew the unfair labor practice charge. On March 13, 1963, petitioner and the Union entered into a stipulation for certification upon consent election. Pursuant to this stipulation, a Board election was held on March 22, 1963, which the Union lost by a vote of 32 to 20. Timely objections to the election were filed by the Union on May 8th and on that date the Regional Director issued his report on the objections and recommended that the election be set aside and that the Board direct a new election.

The initiation of the present case took place on May 28th, when the Union filed a charge which alleged that since January 8, 1963, and in violation of §§ 8(a) (1) and 8(a) (5) of the Act, petitioner had failed to bargain with the Union. On June 27th the Union filed an amended charge in which it included the foregoing allegation and also alleged that by discriminatory conduct as to certain employees petitioner had violated § 8(a) (1).

On June 24, 1963, Hebert Davidson, Gene Harwell, Leonard Pruitt and Henry White, four welders in petitioner's welding shop, walked off the job to protest petitioner's promotion of one Jackie Norris as a leadman. On June 26th, when reporting back to work, they were told that they would be re-employed only upon presentation of doctors' certificates to establish that they had been off due to illness. When the four employees declined to present doctors' certificates, they were not allowed to return to work and shortly thereafter were terminated.

This matter was heard before a Trial Examiner on December 17 and 18, 1963, in Caruthersville, Missouri. On April 20, 1964, the Trial Examiner issued his decision finding petitioner guilty of a violation of § 8(a) (1) because it had, through its supervisors Dinnell and Potts, questioned employee Harwell as to the Union sympathies of his fellow employees and suggested to him that he supply information about them. The Examiner further found that it was a violation of the same section for Foreman Gantz to express the threat that employee Dean would be dis-

charged by the plant manager if he kept on "talking union".

The Trial Examiner found a violation of § 8(a) (1) of the Act in holding that the businessmen of Caruthersville were petitioner's agents in contacting the employees and urging them not to join the Union. A further § 8(a) (1) violation was found by the Examiner to be attributable to petitioner in that Mr. Dunagan, on the eve of the election, questioned employees Davidson and Hundhausen as to what they thought of the Union.

The Examiner further concluded that petitioner did not have a good faith doubt as to the majority of the Union on January 8, 1963, when the Union requested recognition as the bargaining agent for the appropriate unit; but the Examiner, relying on the rule of Aiello Dairy Farms, 110 N.L.R.B. 1365, 1366–1370, held that the Union, by proceeding to an election with full knowledge of the alleged violations of § 8(a) (1) which had occurred in the preelection period, effectively waived a finding of a § 8(a) (5) violation.

The Examiner also concluded, on the basis of the Aiello rule, that petitioner's unilateral plantwide wage increases on March 27 and December 16, 1963, were not additional refusals to bargain, in violation of § 8(a) (5). The Trial Examiner found that petitioner refused to re-employ White, Pruitt, Davidson and Harwell because they had engaged in concerted activity that was protected under § 7 of the Act and that this refusal violated § 8(a) (1).

The Board affirmed the Trial Examiner's decision with respect to the § 8(a) (1) violations but reversed the Examiner by holding that petitioner had violated § 8(a) (5) and (1) of the Act by refusing to recognize and bargain with the Union on and after January 8, 1963, and additionally, by unilaterally granting wage increases on March 27 and December 16, 1963. Thus the Board rejected its own rule in Aiello, supra, and followed its more recent decision in Bernel Foam Products Co., Inc., 146 N.L.R.B. 161.

Petitioner's first allegation of error is that:

"The Petitioner is not guilty of an unfair labor practice in refusing to recognize and bargain with the Union because:

"a—There is no substantial evidence on the record considered as a whole that the Union represented a majority of the employees within the appropriate bargaining unit."

On January 8, 1963, the concededly appropriate bargaining unit under § 9(b) contained a total of 57 persons. Thus, in order to be entitled to recognition, the Union must have represented 29. The General Counsel offered into evidence the authorization cards of 30 individuals who were employed within the above unit on January 8, 1963. All of these cards were dated from December 12, 1962, to January 4, 1963. Petitioner did not dispute the authenticity of the signatures on 19 of these cards which were identified by the individual employees who appeared as witnesses. The remaining 11 cards were identified by the testimony of witnesses other than the signatories. Harlin Crayne testified that he witnessed the execution of cards bearing the signatures of 7 employees. Gail Collins testified that he saw one individual sign; Mike Warren testified that he saw one individual sign a card; and Woodrow Webber testified that he saw Leon Ferrell sign a card. The Trial Examiner found that the testimony of the witnesses to the signing of the 10 authorization cards was credible and that petitioner had not established any coercion or unlawful inducement concerning the signing of these cards, and that they were voluntarily signed. The Trial Examiner would not count the card of one George Stimel, as it was not signed in the presence of the individual who sought to authenticate it, Harlin Crayne. Thus, on January 8, 1963, when the Union requested recognition, the Union had 29 authorization cards from the 57 employees in the appropriate unit. This constituted a bare majority.

Petitioner contends that a number of the 29 cards counted by the Trial Exam-

iner should have been excluded. It argues that the authenticity of a number of the cards counted depended exclusively upon the credibility of Harlin Crayne and that since one card attempted to be authenticated through him was thrown out, it vitiated the rest of the cards authenticated through him. Petitioner also argues that four of the persons signing the 30 cards also signed cards that they did not want a union. Petitioner further contends that one of the 29 cards counted by the Trial Examiner was "clearly the result of fear and did not represent the uncoerced choice of the signer". This latter employee, Downing, identified his signature and stated that the reason he signed the card was because he had previously been involved in a union campaign in another city and the Union blew the front porch off his apartment, poured acid in his car and threatened him several times. Without counting Downing's card, the Union would not have had a majority.

■ Petitioner argues that each employee who signed a card should have personally authenticated his own signature. The law permits alternative methods of authentication. Thus the courts have approved the authentication of such cards by a witness to their execution, N.L.R.B. v. Economy Food Center, 7 Cir., 1964, 333 F.2d 468, 471, or by comparison with a known specimen of the person's handwriting, N.L.R.B. v. Philamon Laboratories, 2 Cir., 1962, 298 F.2d 176, 179–180, certiorari denied, 370 U.S. 919, 82 S.Ct. 1555, 8 L.Ed.2d 498. We find that the Trial Examiner followed accepted authentication procedures here.

■ As to petitioner's argument that four cards should not have been counted because the signers also signed cards that they did not want the union, it should be noted that the allegedly unlawful refusal to bargain occurred on January 8, 1963, at least three weeks before any employees signed cards repudiating the Union. It was during this interim period that the alleged coercive activity took place. Petitioner cannot thus take advantage of defection in the ranks of Union supporters. See Medo Photo Supply Corp. v. N.L.

R.B., 1944, 321 U.S. 678, 687, 64 S.Ct. 830, 88 L.Ed. 1007.

■ Employee Downing's card was properly counted, despite his after-statement that he signed out of fear based upon prior union experience in a different city and at a different time. "[A]n employee's thoughts (or afterthoughts) as to why he signed a union card * * * cannot negative the overt action of having signed a card designating a union as bargaining agent." Joy Silk Mills, Inc. v. N.L.R.B., 1950, 87 U.S.App.D.C. 360, 185 F.2d 732, 743, certiorari denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350. See, also, N.L.R.B. v. Greenfield Components Corp., 1 Cir., 1963, 317 F.2d 85, 89; N.L.R.B. v. Gorbea, Perez & Morell, 1 Cir., 1962, 300 F.2d 886, 887. The Union and the Board were entitled to rely upon this authorization card, as there was no evidence that Downing was subjected to any abuse or coercion by the charging party in the present proceedings.

■ We find that there was substantial evidence on the record considered as a whole from which the Board could conclude that the Union represented a majority of the employees within the appropriate bargaining unit.

The petitioner next contends that:

"Even if the Union represented a bare majority of one as found by the Board the majority status does not require recognition without an election if the employer has a good faith doubt about the majority status of the Union."

Petitioner specifically disputes the Trial Examiner's finding that the pre-election conduct of the citizens of Caruthersville was attributable to it on a finding of agency.

■ The question here presented is whether the petitioner had that essential good faith doubt as to the Union's majority status when the latter demanded recognition, which would entitle it to an election, or whether it sought to dissipate the majority status of the Union, claiming a good faith doubt as a pretext for its illegal action. Although representative status *may* be determined in a Board-conducted election, "A Board election is not the only method by which an employer may satisfy itself as to the union's majority status." United Mine Workers of America v. Arkansas Oak Flooring Co., 1956, 351 U.S. 62, 72, 76 S.Ct. 559, 100 L.Ed. 941, at f. n. 8 and cases cited therein. Where a union has obtained authorization cards signed by a majority of the employees in an appropriate unit, the employer violates § 8(a) (5) of the Act if he refuses to recognize and bargain with the union. The employer is protected from this charge *only* if he has a good faith doubt as to the reliability of the authorization cards. As stated in N.L.R.B. v. Philamon Laboratories, Inc., 2 Cir., 1962, 298 F.2d 176, 179, certiorari denied, 370 U.S. 919, 82 S.Ct. 1555, 8 L.Ed.2d 498:

"The act imposes a duty to bargain in good faith upon request whenever a labor organization has been designated by a majority of employees in an appropriate bargaining unit. The employer must recognize and bargain with such an organization whether or not it has been certified by the Labor Board. United Mine Workers of America v. Arkansas Oak Flooring Co., 351 U.S. 62, 76 S.Ct. 559, 100 L.Ed. 941 (1956); N.L.R.B. v. Sunrise Lumber & Trim Corp., 241 F.2d 620 (2 Cir., 1957), cert. denied 355 U.S. 818, 78 S.Ct. 22, 2 L.Ed.2d 34 (1957). To be sure, an employer laboring under a good faith doubt as to a union's majority status need not extend recognition. *Nevertheless, in the absence of such a doubt, the employer has no vested right to an election.* N.L.R.B. v. Trimfit of California, 211 F.2d 206 (9 Cir., 1954)." (Emphasis supplied.)

The same requirement is stated in N.L.R.B. v. Bedford-Nugent Corp., 7 Cir., 1963, 317 F.2d 861, 864, a case relied upon by petitioner:

" * * * The Board concedes that where, at the time request for recognition is made, the employer has a

**136**

good faith doubt of the union's majority, it may refuse the union's request for recognition without violating Section 8(a) (5). National Labor Relations Board v. Dan River Mills, 274 F.2d 381 (5th Cir. 1960). At least it may withhold recognition until the union's claims are established by a Board-conducted election. The only limitation on this right is that there be a *good faith* doubt on the part of the employer, that is, the employer may not merely use its denial of recognition as a subterfuge for delay or to gain time in which to undermine the union or dissipate its majority. N.L.R.B. v. Taitel, 261 F.2d 1 (7th Cir. 1958), cert. den., 359 U.S. 944, 79 S.Ct. 725, 3 L.Ed.2d 677; N.L.R.B. v. Jackson Press, 201 F.2d 541 (7th Cir. 1953)."

The Trial Examiner found that in the City of Caruthersville for many months during 1962 the R & R Corporation was the *alter ego* of The Colson Corporation. He based this finding upon the fact that R & R originally negotiated Colson's lease with the City, staffed the plant and went into production. New personnel received a book of work rules issued by R & R and payroll checks were received by some employees signed by Horace Dunagan. He found that although Colson's own employees were actually operating the plant, "To all external appearances and, no doubt to many of these employees, they were employees of R & R, of which corporation, Dunagan was the vice president and Gordon Wright, the president." From these facts, the Trial Examiner found that since Colson had for its own advantage used R & R Corporation in its place at the plant and made the R & R Corporation its agent with regard to the employment relationship of the employees, Colson was estopped from denying liability for the acts of the R & R Corporation in the period prior to November 30, 1962 (when the Caruthersville men transferred their R & R shares to Colson and resigned).

The Trial Examiner further found that since Colson did not make any public announcement after November 30, 1962, that the officers and directors of R & R Corporation had resigned and transferred their stock to Colson, Colson would be held responsible for the anti-union campaign conducted by Dunagan, Wright and their associates during the early weeks of January 1963 on the " * * * well established rule of agency that the revocation by the principal of an agent's authority does not become effective as to third persons, in this instance, the employees, until they receive notice to that effect."

The Board found that since some of the businessmen who attended the January 4, 1963, meeting to discuss ways of defeating the Union had also operated the R & R Corporation, and since the change in ownership had not been publicized, " * * * the employees might well have believed that these businessmen were still connected with or at least were agents of the Respondent [Colson]." The Board affirmed the Trial Examiner's findings and reasons, stating:

" * * * we are convinced that the businessmen of Caruthersville acted as agents for the Respondent in attempting to cause employees to abandon their interest in a union, and to revoke or destroy union authorization cards previously given to the Union. We also agree that the interrogation of employees about their union sentiments on the eve of a scheduled representation election and attempted surveillance of employees' union activities were violative of Section 8(a) (1). All of such conduct supports our conclusion that Respondent's refusal to bargain was not motivated by a good-faith doubt about the Union's majority status but was designed to gain time in which to undermine the Union's majority. We conclude that Respondent's refusal to recognize and bargain with the Union on and after January 8, 1963, is violative of Section 8(a) (5) and (1)."

There is no question but that the activities of the local businessmen were co-

ercive. The remaining question is whether that conduct can fairly be attributable to Colson. Petitioner disclaims responsibility, arguing that the local citizens involved ceased being officers of the R & R Corporation on November 30, 1962, prior to the Union's organizational drive and, further, the company, by posting its notice of January 28, 1963, put the employees on notice that the businessmen were not acting as agents for the company.[1]

 We believe the Board correctly determined that an agency relationship existed between Colson and the local citizens and, further, that this relationship was not revoked by the notice of January 28th. As stated in N.L.R.B. v. Arkansas-Louisiana Gas Co., 8 Cir., 1964, 333 F.2d 790, 795:

> "In determining responsibility for union activities, the principles of agency and its establishment are to be construed liberally."

29 U.S.C.A. § 152(13) provides:

> "In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." (61 Stat. 139)

The record shows that the businessmen acted in Colson's interests. It is obvious from the statements made to the employees by the businessmen that the latter feared increased costs to Colson might force the company to leave town. Colson was aware of the activities of these citizens but made no effort to inform the employees that the businessmen were not acting for the company until January 28th. Dunagan was a frequent visitor at the plant even after the 30th of November. The businessmen, through the use

of CIDC, were instrumental in locating Colson in Caruthersville. It was stipulated that the R & R Corporation was formed to keep Colson's name out of the negotiations with the City and it is undisputed that Colson was aided by the services rendered to it by R & R. The January 28th notice was asserted to have been an effective revocation of any authority the businessmen might have had. The Board found that the notice was inadequate under the circumstances to erase the impression in the employees' minds of the connection between Colson and the businessmen. The notice did not repudiate the previous unlawful conduct nor did it state that such conduct was against company policy. The notice was not posted until approximately three weeks after the coercive conduct of the businessmen and the notice failed to state that R & R was no longer the agent of Colson. The businessmen were not mentioned by name, though most assuredly Colson knew that Dunagan was leading the anti-union battle and after the notice was posted January 28th the company's own supervisors committed independent § 8(a) (1) violations which undoubtedly led employees to question the company's true position. In N.L.R.B. v. Solo Cup Co., 8 Cir., 1956, 237 F.2d 521, at 524, we stated that there was ample justification for the Board's statement in that case:

> "Nor was the Respondent relieved of such responsibility because of any instruction it issued to management personnel to remain neutral concerning union matters, *as these instructions, in any event, were not communicated to the employees.*" (Emphasis supplied.)

In N.L.R.B. v. Economy Food Center, Inc., 7 Cir., 1964, 333 F.2d 468, at 472, it was stated:

> " * * * The existence of a good faith doubt, in light of all the cir-

---

1. "We have heard that some local businessmen have spoken with some of our employees concerning the organization of this plant by a union.

 "The Company wishes it known that this was done on the businessmen's own

initiative and that they were not authorized by the Company to speak on behalf of The Colson Corporation.

W. A. SHEFFIELD,
Plant Manager."

cumstances, raises mainly a question of credibility, N.L.R.B. v. Crean, 326 F.2d 391 (7th Cir. 1964), * * *."

■ On this record considered as a whole, we find substantial evidentiary support for the Board's finding The Colson Corporation did not have a good faith doubt as to the majority status of the Union and that its refusal to bargain was motivated by a desire to gain time in which to dissipate that majority. There is also ample support for the Board's finding that The Colson Corporation was responsible for the coercive activity of its agents and that the employees were in fact intimidated and coerced.

■ The petitioner's next contention is that:

"* * * Having elected to proceed by the election processes of the act, the Union cannot now obtain recognition by this unfair labor practice procedure."

As previously stated, the Union filed an unfair labor practice charge against the petitioner after it had petitioned for an election. The Union withdrew this charge and proceeded to an election, which it lost. Thereafter the Union filed a charge alleging violations of § 8(a) (5) and (1) for failure of petitioner to bargain with it on and after January 8, 1963.

The Trial Examiner found that The Colson Corporation did not have a good faith doubt of the Union's majority status, but he concluded that the Union had waived its right to file a § 8(a) (5) charge, relying on the Board's rule in Aiello Dairy Farms, which held that a union waives a refusal to bargain charge by proceeding with an election. After the issuance of the Trial Examiner's decision and while this case was pending before the Board, the Board, in Bernel Foam Products Co., Inc., 146 N.L.R.B. No. 161, reversed its holding in Aiello. Thus, the Board in its decision relied upon Bernel Foam, rejected the "waiver" theory and held that the company had violated § 8(a) (5).

Petitioner argues that:

"* * * as a matter of law, the ruling in Bernel is wrong. The two procedures are mutually inconsistent. A petition for an election proceeds upon the basis that there is a question of representation. A refusal to bargain charge proceeds upon the theory that there is no question of representation * * *."

The Board contends that:

"The 'election of remedies' rule set forth in Aiello does not, of course, rest upon a statutory command. Rather, the ultimate issue presented is whether the Board properly exercised its discretion in fashioning a remedy where the employer has unlawfully refused to recognize the union *and* has unlawfully interfered with an election."

The position of the Board is that the choice of a remedy and the means of determining the employees' choice of a bargaining representative are matters within the Board's discretion.

Apparently only one other Court of Appeals has been faced with the resolution of this question. The District of Columbia Circuit, in International Union of Electrical, Radio & Machine Workers, AFL–CIO v. N.L.R.B., decided May 13, 1965, stated at page 3 of the slip opinion:

"* * * In particular, the Employer argues that the Union waived its right to file refusal-to-bargain charges by its action in proceeding to an election. This may have been a valid position under the rule announced in Aiello Dairy Farms, 110 N.L.R.B. 1365 (1954). But the Board has now rejected that rule, and, we think, it was within its statutory authority in so doing. See Bernel Foam Products Co., 146 N.L.R.B. No. 161 (1964); National Labor Relations Board v. Stow Manufacturing Co., 217 F.2d 900 (2d Cir. 1954), cert denied, 348 U.S. 964, 75 S.Ct. 524, 99 L.Ed. 751 (1955); National Labor Relations Board v. Howell Chevrolet Co., 204 F.2d 79 (9th Cir. 1952), aff'd, 346 U.S. 482,

74 S.Ct. 214, 98 L.Ed. 215 (1953); cf. National Labor Relations Board v. Seven-Up Bottling Co., 344 U.S. 344, 349, 73 S.Ct. 287, 97 L.Ed. 377 (1953); Dayton Typographical Union No. 57 v. National Labor Relations Board, 117 U.S.App.D.C. 91 at 104 ff., 326 F.2d 634 at 645 ff. (1963). And see Comment, 39 N.Y.U.L.Rev. 866 (1964)."

We conclude that the Board's decision here comes within the scope of the statutory power granted to it by Congress. This question seems to be predominantly a matter committed to administrative discretion.

■ Petitioner next contends that:

"The Petitioner was not guilty of unfair labor practice in refusing to reinstate the four welders because:

a—The welders were engaged in a walkout and protest of a promotion of a lead man. Promotion is exclusively a function of management and concerted activities respecting such matters are not protected by the Act."

On June 24, 1963, Davidson, Harwell, Pruitt and White, four welders in Colson's welding shop, walked off the job to protest the promotion by Colson of one Jackie Norris as a leadman. The record indicates that in May 1963 Pruitt became acting leadman in the welding shop (though he received no increase in pay) and that sometime in June Jackie Norris was hired by Colson to work as a welder. On or about June 21, 1963, a Colson foreman posted notice to the effect that thereafter Norris would be the leadman. The tangible result of this position was an increase in pay of 10¢ per hour over the other welders and, as the Trial Examiner found, "* * * gave him [Norris] some authority over the other welders * * *." The welders who had been in the shop for some time protested to their foreman that the position should have gone to Pruitt, who apparently was a more experienced welder, rather than to

a new man. It is undisputed that on the morning of June 24th Davidson told the foreman that if The Colson Corporation did not put Norris back on the same pay scale as the other welders or bring the other welders up to his new scale, they would walk out. At noon on June 24th, after receiving no satisfaction from their demands, the four employees walked out of the plant. On June 25th a foreman visited Harwell and told him that if he wanted to return to work the company would insist upon a doctor's certificate establishing illness.[2] Harwell informed the foreman that he would not accept this strategy. The four employees returned to work in the early morning hours of June 26th but were not allowed to work as they had no doctor's certificate. Shortly thereafter they were terminated and were never re-employed. On these facts, the Trial Examiner concluded that these employees were engaged in protected concerted activity on June 24th and 25th; that they were economic strikers; and that they were entitled to re-employment if, at the time they abandoned their strike, they had not been replaced.

The Board argues that:

"It is true, as petitioner has pointed out, that several cases have held that promotion to supervisory positions is a management prerogative, immune from employee protest * * *. But these cases are inapplicable here."

The Board's contention is that the supervisor of the welding department (Potts) at all material times was the same man and that the disputed vacant position was that of "leadman", which position did *not* encompass supervisory functions. Therefore, the cases relied upon by petitioner, while correctly holding that the Act does not cover concerted activities which seek to alter management's choice of its own representatives, do not apply to the present situation. We agree with the Board. In National Labor Relations Board v. Southern Bleachery & Print Works, Inc., 4 Cir., 1958, 257 F.2d 235, 237, certiorari denied, 359 U.S. 911, 79 S.Ct. 588, 3 L.Ed.

2. Colson had a plant rule that an unexcused absence of three days would subject an employee to the penalty of discharge.

2d 575, a case concerned with whether certain workers were "supervisors" or employees, the court said:

"* * * The issue of fact is whether each machine printer is a supervisor of the three helpers in his unit, or merely a lead man of greater skill and authority than his helpers but without supervisory authority as defined in the statute."

At page 239 of 257 F.2d, it is further stated:

"* * * It is a question of fact in every case as to whether the individual is merely a superior workman or lead man who exercises the control of a skilled worker over less capable employees, or is a supervisor who shares the power of management."

The court in Southern Bleachery & Print Works supported the Board's determination that the workers were employees and not supervisors, even though the employees were in charge of cloth printing machines, at which other men worked, and the employees checked the quality of the cloth printed on the machine over which they had control, initialed pay increase cards, time cards, and requests for materials. The work of the "leadman" in the present case does not encompass such a wide range of supervisory control. The "leadman" here helped the other welders with their problems in the shop and, as a consequence, received an additional 10¢ in remuneration. In Cleaver-Brooks Mfg. Corp. v. N.L.R.B., 7 Cir., 1959, 264 F.2d 637, certiorari denied, 361 U.S. 817, 80 S.Ct. 58, 4 L.Ed.2d 63, and Dobbs Houses, Inc. v. N.L.R.B., 5 Cir., 1963, 325 F.2d 531, two cases relied upon by petitioner, the controversy was over the discharge of management representatives; i. e., a protest over the appointment of a foreman and a protest over the alleged discharge of an assistant manager-supervisor. The instant case involves no dispute by the employees over management's selection of its representative; rather, the employees were protesting the selection by management of a relatively new and inexperienced welder to be "leadman" in preference to the one employee who had been doing the work and who apparently had been promised the job. As stated in International Union of United Brewery Workers, etc. v. N.L.R.B., 1961, 111 U.S.App.D.C. 383, 298 F.2d 297, at 303, certiorari denied, Gulf Bottlers Inc. v. N.L.R.B., 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847:

"It has seemed to us that if a mere employee at some stage may become a supervisor, the transition becomes an actuality when he is found to possess real power 'in the interest of the employer' to take meaningful action with respect to the statutory tests. It is not alone that he may hire or fire or lay off or discipline. He must do so in the interest of the employer. He must then, when acting, become in effect a part of management, *not simply a lead man or straw boss.*" (Emphasis supplied.)

We find that the four employees who left their jobs were not protesting the promotion of another employee to a supervisory position and that the cases relied upon by petitioner have no application here.

■ Petitioner also contends that, "Even assuming the promotion of the lead man was a protected activity, the * * * means employed by the welders were not a protected activity because their conduct was only an intermittent work stoppage * * *", relying on this court's opinion in N.L.R.B. v. Montgomery Ward, 8 Cir., 1946, 157 F.2d 486, at 496, where it is stated that employees "* * * could not continue to work and remain at their positions, accept the wages paid to them, and at the same time select what part of their allotted tasks they cared to perform of their own volition * * *." But the Montgomery Ward case, supra, is inapposite in this situation. Here the four employees, after protesting strenuously to Foreman Potts over the manner in which the lead man was selected, walked out of the plant and did not return until June 26th, when they sought full reemployment. This is not a situation of intermittent work stoppage.

Petitioner's next contention is that:

"Assuming that the walkout was a protected activity, the welders had been permanently replaced and therefore there was no obligation on the part of petitioner to reinstate them."

This is undoubtedly a correct statement of the applicable law and if, in fact, the employees, being economic strikers, had been replaced, petitioner would be under no obligation to reinstate them. N.L.R.B. v. Mackay Radio and Telegraph Co., 1938, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381. The evidence shows that Howell, Colson's plant superintendent, contacted a vocational training school immediately after the walkout at noon on June 24th. He could not reach anybody at the school on the 24th but he succeeded on the 25th of June. Howell testified that he requested the school to send over three or four welders and the next day, June 26th, a Wednesday, two welders reported. These two welders were given a welding test, which they passed, and Howell testified that they were hired to work for Colson. The welders were to report for work on the following Monday and on that date one welder decided not to take the job and the other welder apparently never even showed up for work. On Tuesday, June 25th, petitioner alleges that a permanent replacement was transferred into the welding department from the grinding department and on that same day a welder who had been on sick leave reported back to work. Therefore, the company contends that since the two welders were hired from the training school (though they subsequently turned down the job) and two more men previously connected with Colson moved into the welding department, all four of the welders who walked off the job on June 24th had been permanently replaced.

The Trial Examiner found that the four welders who walked out on June 24th reported back to work at 7 o'clock the morning of June 26th. Howell testified that the two applicants from the training school were given their tests at about 8:30 and were notified around 9 o'clock that they were hired. Therefore, the four employees seeking re-employment were turned away before any job applicants appeared at the plant. As for Colson's contention that White was replaced during his absence because he "would have had to be laid off in order to make room for the welder reporting back from sick leave", the Board rejected this contention as being based upon "unconvincing" testimony. No evidence was ever introduced to show that White had been hired only to serve as a temporary employee until the regular welder regained his health. More damaging, though, to Colson's assertion as to White is the fact that Foreman Potts told White when he reported back for work on the morning of June 26th that if he would concede that he had been "sick", a job would still be open for him. The Trial Examiner also found that the employee moved from the grinding department to the welding department was not intended by Colson as a permanent replacement for any of the strikers.

We agree with the Board that petitioner refused to reemploy the four men because of their concerted activity protected under § 7 of the Act and that by so doing it committed a violation of § 8(a) (1).

The petitioner complains next of a finding by the Trial Examiner that:

"It was a violation of Section 8(a) (1) of the Act for the Respondent, through its supervisors Dinnell and Potts, to question employee Harwell as to the union sympathies of his fellow employees and to suggest that he supply such information about them. It was equally violative of this same section of the Act for the Respondent, through Foreman Gantz, to express the threat that employee Dean would be discharged by the plant manager if he kept on 'talking Union.'"

Employee Gene Harwell was requested by company assembly room foreman Dinnell to talk to the employees in the welding department "and find out how they

felt about the Union and which way they were going to vote". Harwell added that Dinnell "wanted me to talk to the welders and try to get them not to vote in a union". About a week before the election, company welding department foreman Earl Potts asked Harwell what he thought about the union and proceeded to question Harwell about his fellow employees. Potts also requested Harwell to talk to other employees and try and convince them that no union was needed. Employee Robert Dean was approached by company foreman Vernon Gantz after the election and accused of talking on behalf of the Union to other employees. Gantz warned Dean that Plant Manager Sheffield was aware of his conduct "and the next time it happens he is going to fire you". Gantz told Dean he was giving him this information for his own benefit.

Petitioner states that:

"It is Petitioner's position that these conversations [between employee Harwell and Foreman Potts and Dinnell] did not violate the Act because it is not a violation of the Act to question employees concerning Union sympathies."

For support, petitioner relies on N.L.R.B. v. Trumbull Asphalt Co. of Delaware, 8 Cir., 1964, 327 F.2d 841. We believe that case is factually different. There the superintendent, after learning from the union that it claimed a majority, questioned one Johnson as to who "was for the Union", and a few days later he again asked Johnson who the head of the union was. The court found that neither the superintendent nor Johnson mentioned names and the superintendent did not speak against the union. In our case, in addition to asking Harwell generally about union support, Foreman Dinnell requested Harwell to try to get the welders not to vote for the Union. Foreman Potts engaged in a similar request.

As to the finding that a § 8(a) (1) violation also occurred when Foreman Gantz warned Dean that he would be discharged if he kept on talking for the Union, petitioner states that:

"* * * It was merely an instruction to the employee not to use the employer's premises during working hours for Union activity."

The Trial Examiner did not so find. In the circumstances of this case, we cannot say that his decision was not supported by the evidence. The Trial Examiner specifically found that the testimony of Harwell and Dean was credible and was not contradicted or denied. None of the supervisors was called as a witness. It was a permissible conclusion for the Trial Examiner to find that the statement to employee Dean was a threat and an interference with his rights and, as such, constituted a violation of § 8(a) (1).

The Board's order will be enforced in its entirety.