**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Daniel CREAN and Joseph Messore d/b/a The Grand Food Market, Respondents.**

**No. 14181.**

United States Court of Appeals
Seventh Circuit.

Jan. 3, 1964.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Alfred Brummel, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Melvin J. Welles, Atty., N. L. R. B., Washington, D. C., for petitioner.

Walter S. Davis, Milwaukee, Wis., Robertson, Hoebreckx & Davis, John G. Vergeront, Milwaukee, Wis., for respondents.

Before DUFFY, SCHNACKENBERG, and KNOCH, Circuit Judges.

KNOCH, Circuit Judge.

The National Labor Relations Board has petitioned this Court pursuant to § 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. §§ 151 et seq., for enforcement of its order issued October 15, 1962, reported at 139 NLRB No. 16, p. 73.

The Board found that Daniel Crean and Joseph Messore, doing business as The Grand Food Market, respondents (hereinafter sometimes called "Grand Food") had violated §§ 8(a) (1), 8(a) (3) and (1) of the Act by coercing and discriminating against employees during a union organizational campaign; and

had further violated § 8(a) (5) and (1) of the Act by refusing to bargain with Retail Store Employees Union Local 444, Retail Clerks International Association, AFL-CIO (hereinafter sometimes called the "Union").

The Board found that the Union's campaign to organize Grand Food's employees began in August, 1961, and that the Union held authorization cards from 15 of Grand Food's employees by September 20, 1961.

On September 20, 1961, the Union wrote Grand Food stating that it represented a majority of all regular full and part time employees who handled, displayed or sold merchandise, excluding meat department employees, supervisors, watchmen and all those who had a proprietary interest. The Board subsequently added to the unit the four meat department employees who had not signed any authorizations. The addition of these four brought the total number of employees in the unit to 29.

In its letter of September 20, 1961, the Union offered to permit a neutral person to check its authorization cards to verify its claim of majority status.

Grand Food's attorney answered the Union's letter under date of September 22, 1961, stating that Grand Food had no basis for believing that the Union represented a majority of the collective bargaining unit for which recognition was demanded, and suggesting that the Union seek certification, adding:

"No purpose will be served in the meeting that you suggest until such time as you have been certified as the collective bargaining representative."

Nothing was said about checking cards.

The Board relies on testimony from numerous employees respecting interrogation by management as to whether they attended or proposed to attend Union meetings, whether they signed authorizations (many said that they had), or whether other employees attended meetings. Some employees testified that threats were made in the course of these conversations. Typical instances include the following.

Thomas D'Amato testified to a conversation with Daniel Crean, one of the partners, who was in charge of the grocery and meat departments of Grand Food, during which Daniel Crean said he knew that Glenn Wiese, who worked in the grocery department, had signed a card, and that Glenn Wiese was one of those who would be on their way out if Mr. Crean could find a way.

Kathi Tate said that when she asked Mr. Crean for a work schedule consistent with her school attendance, he told her there was a dependent connection between her work schedule and her vote respecting the Union.

Several employees testified that both Mr. Crean and his partner, Joseph Messore, voiced opposition to the Union, not only on the score of its likely interference with their managerial prerogatives and the efficiency of employee assignments and remuneration, but also on the ground that they considered the Union to be composed of pirates and racketeers. Mr. Crean was still of that opinion when he testified before the Trial Examiner in this case. While the Trial Examiner considered these statements to be legitimate expressions of opinion protected by the Act, he was justified in finding that Crean was openly adverse to Union organization.

Patricia Watzka testified that Mr. Crean, after complaining of her use of company time for discussion of the Union, asked her why she wanted a union, to which she replied that she was receiving less pay than other employees. The following day, she testified, he gave her a raise to $1.25, with promises of more "when this all blows over." Mr. Crean denied any such promises, stating that top wage rate for female help was $1.25.

Mary Kathryne Jacobs, who told Mr. Messore that she had not signed a union card, testified that she was offered a raise to $1.35 to stay, and that Mr. Messore said he wanted her there when the Union vote came up because he knew

she would be on his side. She also testified that Mr. Messore said he was displeased with the way some of the employees were acting and that Barbara Bahringer would be the next to go.

Barbara Bahringer testified that in the course of a conversation about Union meetings, Mr. Messore gave her a raise in pay and told her to "be a good girl and don't attend the meetings." She did attend meetings, however, and subsequently was laid off immediately after the Union advised Grand Food that it commanded a majority of the employees. Grand Food witnesses testified that the juxtaposition of these events was mere coincidence, and that the lay-off was dictated by a seasonal slump.

Susan Moser testified that when she answered a newspaper advertisement for checkers, prior to the organizational activity of the Union here involved, Mr. Crean asked whether she belonged to a union. She testified that Mr. Crean told her that he could not afford union scale wages and that she would have to leave that union before he could discuss employing her. She said she agreed, terminated her union membership, returned to the Grand Food store and was hired. Mr. Crean testified that Miss Moser complained she was not getting enough hours of work at her former place of employment, admitted that the union there had done nothing to help her, and stated that she intended to leave it. He said that he then told her to go ahead and attend to her personal affairs, come back, and he would talk to her again; that he made no promises of hiring her if she left the union.

■ On either version, the Board was warranted in drawing the inference that Grand Food had made Susan Moser's withdrawal from a labor organization a condition of employment, thus discouraging membership in a labor organization in violation of § 8(a) (3) of the Act.

■ The credibility of these witnesses presents an issue for determination by the Board. N. L. R. B. v. Sawyer Downtown Motors, 7 Cir., 1954, 213 F.2d 514, 515; N. L. R. B. v. Aurora City Lines Inc., 7 Cir., 1962, 299 F.2d 229, 232.

■ Grand Food's subsequent offer to reinstate Barbara Bahringer does not bar the Board's finding that she was wrongfully laid off within the meaning of the Act. N. L. R. B. v. Bachelder, 7 Cir., 1942, 125 F.2d 387, 388.

■ There is substantial evidence in the record as a whole to support the Board's findings that Grand Food coerced and discriminated against employees in violation of the Act. N. L. R. B. v. Thompson Ramo Wooldridge, Inc., 7 Cir., 1962, 305 F.2d 807, 808–809 and cases there cited.

The Board did not believe that Grand Food had a good faith doubt of the Union's majority status. The Board found Grand Food's unfair labor practices and its disregard of the Union's offer to prove a majority status to be inconsistent with a good faith doubt.

Grand Food argues that the Union in fact had no majority status. In support of this point, Grand Food lists the employees in the appropriate bargaining unit, as determined by the Board, on September 20, 1961 (the date of the Union's demand) plus Fred Rathkamp [1] and Neil Bloxham. This list includes a total of 31 persons. Union authorizations of 15 were produced at the hearing. The Board excluded from consideration a 16th authorization—that of Corenne Belt, as she was no longer an employee after September 15, 1961, and the Board was using the date of September 22, 1961, the date Grand Food questioned the Union's majority status.

With respect to Miss Belt, the Board adopted the Trial Examiner's finding that, while there was some suspicion that she may have been forced to quit because of her union adherence, her long record of unsatisfactory performance supported Grand Food's contention that she quit because of criticism and cor-

1. —Sometimes spelled Rathcamp.

rective action induced by her own conduct on the job.

■ The Trial Examiner excluded Fred Rathkamp as a supervisor and omitted Neil Bloxham from the unit without comment. The testimony shows that Neil Bloxham was an electrician who occasionally did electrical work for Grand Food. He was paid $20.00 for installing a bell system on the meat counter during the week which included September 20 and September 22, 1961. Grand Food contends that both should be included in the unit.

With respect to Mr. Bloxham, Grand Food argues that the Board's policy is not to eliminate maintenance personnel in retail establishment bargaining units and that Neil Bloxham was not eliminated by the Board's description of the adopted unit. Grand Food relies on the following statement in the intermediate report:

"I find that all *regular* full-time and part-time employees of Respondents employed at their Milwaukee store, excluding all those with a proprietary interest, wives and children of owners, watchmen, and all supervisors as defined in the Act constitute a unit appropriate for the purpose of collective bargaining within the meaning of Section 9(b) of the Act. [Emphasis added.]"

When asked whether Neil Bloxham was the electrician *regularly* employed at the market, Daniel Crean testified that he was not.

Grand Food argues that Fred Rathkamp does not qualify as a supervisor under the language of the Act as he has no authority:

"* * * to hire, transfer, suspend, lay-off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust grievances, or effectively to recommend such action [provided] such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

The Trial Examiner found that Mr. Rathkamp:

"* * * works in the produce department, is one of the oldest employees in the store, and knows all phases of the business well. He is paid $150, a week salary, far more than other salaried and nonsalaried employees in the produce and grocery departments. He has no power to hire, fire or discipline employees, and does produce work like other employees under the supervision of Messore. Because of his experience, he relays Messore's daily orders about display and handling of produce to other employees and sees that the orders are carried out. He also helps to break in new employees in their duties. While lacking specific hiring and firing authority, Respondents admit that in matters involving hiring, firing, and discipline, they would respect his judgment and recommendations as against those of employees of lesser experience. When Respondents are out of the store, one of their wives is usually in charge of operations, but when all four are absent, Rathcamp is in charge. This situation occurs regularly every Tuesday night, at which time Rathcamp is responsible for closing up the store, making sure that lights are out, registers cleaned out, safe locked, and doors locked."

There was some testimony that other employees regarded Mr. Rathkamp as their supervisor.

■ Mr. Messore testified that Mr. Rathkamp never had recommended hiring or firing anyone, and that his recommendations would not be given more weight than the recommendations of another employee, but explained:

"Only I probably would respect Fred's judgment on any particular subject more than I would another inexperienced person. I would pay attention, Fred was born in the business, practically."

In describing Mr. Rathkamp's duties on Tuesday nights, Mr. Messore testified:

> "Fred is a trusted employee and he checks the store out. He sees that the lights are closed, the back doors are locked and the money is put away, that the girls put the money in the safe. He looks to see that the safe is locked, turn the handle on the safe and sees that that's safe."

The Trial Examiner reasonably inferred that:

> "Presumably this may involve giving orders to those employees who handle the registers in all departments."

The question may be a close one, but we cannot say that this record warrants our setting aside the Board's conclusion that Fred Rathkamp was a supervisor within the meaning of the Act and was, therefore, to be excluded from the unit.

Grand Food contends that a card check (as suggested by the Union) would have been futile for several reasons. Grand Food asserts that it would have insisted on a unit which included Neil Bloxham, Fred Rathkamp and the four meat department employees, although the reply to the Union's demand questioned only the majority status, not the composition of the proposed unit. Grand Food also contends it would have disregarded the authorization signed by Theodore Pettelman because he told Mr. Messore that he signed only to secure an election; that he proposed to vote against the Union at the election. Grand Food believed this was true of several other employees. Mr. Messore and Mr. Crean were told only five employees had attended the Union meeting of September 19, 1961, and they believed, as they had been told, that their employees had little interest in the Union. Thus, Grand Food concludes, a good faith doubt clearly existed. Besides, Grand Food asserts, it was anxious to hold an election and did nothing to delay it, even maintaining in its employ some known Union adherents, most of the alleged unfair labor practices having occurred before the Union presented its demand.

The Board notes that the authorization cards were clear and unambiguous; that at the hearing virtually all the employees indicated that they understood what they signed; that none of the employees had revoked his authorization at the time of the hearing.

■ The existence of a good faith doubt in the light of all the circumstances raises mainly an issue of credibility. The Trial Examiner who heard the witnesses rejected Crean's contention:

> "* * * because the widespread, long continued, and unlawful interrogation of employees by Respondents, coupled with their other unfair labor practices found above, convince me that as soon as they learned of the union campaign on August 24, they embarked on a counteroffensive to dissuade employees from adhering to the Union; as they did this in large part by unlawful means, the conclusion is impelled that they were motivated, not by a bona fide doubt of the Union's majority *status*, but by a desire to prevent it by any means from *achieving* that status. While not engaged in a campaign to "gain time to undermine" an existing and known union majority status, they were using unlawful means to prevent the Union from gaining that status. Although the Union apparently achieved majority representation despite Respondents' unlawful countermoves, it is not open to Respondents now to claim that they could have had a good faith doubt about its status at any time during the campaign, when they engaged in a wide variety of unlawful acts of the type well calculated to prevent the Union from acquiring that position. In addition, at least one of their unlawful acts, the discriminatory lay-off of Bahringer, occurred after they had received notice of the Union's claim and request for recognition. In light of all Respondents' conduct, I must conclude that Respondents at no time had a good faith doubt of the Union's ma-

jority status. [emphasis by the Trial Examiner, footnote omitted.]"

We have considered all other points and arguments raised by Grand Food, but our study of the record as a whole leaves us with the conviction that the Board's findings are supported by substantial evidence. The Board's Order will be enforced.

Order enforced.