## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## REALIST, INC., Respondent.

### No. 14281.

United States Court of Appeals Seventh Circuit.

Feb. 25, 1964.

Rehearing Denied March 31, 1964.

Rehearing Denied En Banc March 31, 1964.

Schnackenberg, Circuit Judge, dissented.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Paul J. Spielberg, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Melvin Pollack, Atty., N. L. R. B., Washington, D. C., for petitioner.

Herbert P. Wiedemann, Milwaukee, Wis., for respondent.

Before HASTINGS, Chief Judge, and SCHNACKENBERG and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

The National Labor Relations Board requests that its order issued May 13, 1963, be enforced against respondent, Realist, Inc., a manufacturer of cameras and other optical goods, located in Berlin, Wisconsin. The order directs the company to bargain with the Allied Industrial Workers of America, AFL–CIO, and to desist from engaging in unfair labor practices within the meaning of section 8(a) (5) and (1) of the National Labor Relations Act. The Board's decision is reported at 142 N.L.R.B. No. 66 (1963). A summary of the facts follows.

In June, 1962, the union filed a petition with the Board for a representation election among the company's production and maintenance employees. The company and the union thereafter agreed to an election which the Board scheduled for July 17, 1962.

On July 6, the company increased the wages of forty-four of the 119 employees. The president of the company on July 9 spoke to the employees in groups of eight to ten in his office. The day before the election he addressed all plant employees in a thirty-minute speech. We incorporate that part of the speech which we deem pertinent to one of the issues presented.[1]

1. "They demand rules that prevent us from moving you from one job to another, as the occasion might arise, and they have rules that prevent you from getting overtime instead of our hiring extra people. This all causes us to overhire and it also causes more frequent and severe layoffs. * * *

"We've got good, competent people who have had job security for 5 years, 10 years, 15 years, yes, 20 years, and they have had job security without any union help, whereas some of those that had union help haven't got jobs today. So, I ask you—who can give you the best job security? * * *

"And, as I have also said to you, we will continue to improve wages and benefits to the extent of our ability to do so and as the ability of each of you warrants. All of these are reviewed every six months and action is taken on them as we see fit. * * *

"What is best for all of you, for all employees, is steady work day in and day out, the kind of employment that leads or helps a person to lead a normal and respectable way of life. This does not happen in plants where the union policy causes frequency [sic] and severe lay off periods and recalls. * * *

"And, just what is the end result of a union policy for higher wages and shorter or less work hours. Stop and dwell on this for a moment. In many cases, the end result is no work at all. You have all read in the newspapers, as I have many times, of unionized plants moving out of the State of Wisconsin for a better place to operate. How many non-union plants have you read about moving out. I haven't read about any. So, ask yourself, is this the management policy or the union policy that causes these things to happen. In my opinion it's very clear—it's the union policy. * * *

"If you're competent—if you're capable—if you're good—your wages are reviewed every six months and you don't have to strike or you don't have to spend a lot of your own money as a striker to get those benefits. If you listen to the union, you would think that a seniority list in a union is the answer to everything. Really, though, all it does is just give you a number. It doesn't stop the severe and frequent layoffs which the union policy often promotes. * * *

"These people talk about equal pay for equal work. Well this isn't new, we've done this all along and will continue to do it—union or no union."

The speech also included the following statement:

"Maybe some of you read in the newspapers, as I did, just this past weekend where the Allied Industrial Workers organized the Peerless Woolen Mills. Their demands were such that the people running this plant said—there's no point in

The majority of employees voted against the union in the election. Thereupon, the union filed objections with the Board contending that the company had interfered with the employees' freedom of choice.

The Board's regional director conducted an investigation and then recommended the election be set aside. He found that the company had interfered with the employees' rights to a free election by (1) granting pre-election wage increases to certain employees in a manner calculated to influence the outcome of the election, (2) anti-union talks by the president to small groups in his office, (3) the president's speech to employees which was calculated to engender fear of economic loss if the union won the election, and (4) the president's misrepresentation to the employees that the union had caused the closing of another plant in Wisconsin through its unreasonable contract demands.

The Board adopted the regional director's report and ordered a new election.

At the second election in December, 1962, the majority of the employees voted for the union, and the Board certified the union as the collective bargaining representative of the company's employees. The company, however, refused to bargain with the union contending that the first election had been improperly set aside, that the second election was contrary to law,[2] and that the certification was void.

The union then filed the instant charge, alleging that the company had violated section 8(a) (5) and (1) of the act. The trial examiner concluded that the company had violated the act by refusing to bargain with the union and by such refusal it had interfered with and coerced its employees in the exercise of rights guaranteed by section 7 within the

meaning of section 8(a) (1). The Board affirmed.

Respondent contends that the Board abused its discretion in ordering a new election because its action was unreasonable and arbitrary. First, it says that the wage increases granted in June, 1962 were formulated under its merit review system and were initiated before it had knowledge of the election. The company argues that it should have been afforded a hearing either by the regional director or by the trial examiner in order to prove these facts. Second, respondent says that the speech made by the company president should not have been considered by the Board; but even if considered, it was within the protective provisions of section 8(c) of the act and was free of misrepresentations. Finally, respondent says that the meetings of the president with groups of employees were not coercive and did not justify the Board's setting aside the election.

■ If any one of the grounds upon which the Board based its action was reasonable, the Board was warranted in setting aside the election. We have concluded that the Board could reasonably find that the speech by the company president interfered with the employees' freedom of choice so as to require a second election; therefore, we will not discuss the other contentions. However, if there had been no speech and we had considered these issues, a different result might have been reached.

■ Before we discuss the president's speech, we must dispose of respondent's preliminary contention that the regional director had no right to consider the speech because the union had not included it in its objections. Respondent argues that by allowing consideration of the speech the Board ignored its own regulation.[3] It also argues that the

going on—life is too short—we will sell the machinery—lock the doors and quit— and, they did and 1,700 people are today without jobs in that community."

2. Section 9(c) (3) of the National Labor Relations Act precludes the Board from

directing an election "in any bargaining unit or any subdivision within which in the preceding twelve-month period, a valid election shall have been held."

3. The Board's regulation, § 102.69, provides that any party may file with the re-

Board vacillates in considering objections; that whenever the Board elects to exclude untimely objections, it refers to its requirement of timeliness; whenever it elects to rely upon untimely objections, it explains that post-election investigations are not limited to the issues raised by the parties.

Respondent, however, fails to distinguish two facets of a regional director's post-election investigation. The director may properly decline to consider objections of the parties that are not timely brought to his attention. But this limitation does not preclude his consideration of matters which he may choose to investigate independently, regardless of the fact they may be included in the objections.

 We are of the opinion that many of the president's remarks, even when considered in the context of the entire speech, were calculated to create fear in the minds of the employees that their jobs were in jeopardy should the union win the election. The reference to "unionized plants moving out of the State of Wisconsin for a better place to operate" and to the shutting down of the Peerless Woolen Mills after it had been organized by the Allied Industrial Workers can reasonably be interpreted as a veiled or implied threat to remove respondent's operations from Wisconsin if the union prevailed. Moreover, these intimations were coupled with remarks which conveyed the idea that it would be futile to join the union—that the company would afford benefits equally as good, if not better, to its employees if there were no union.

We are satisfied that the Board could reasonably conclude that the speech on the eve of the election instilled in the employees a fear of economic loss and a sense of futility which destroyed the laboratory conditions in which the Board must hold elections and prevented a free choice by the employees.

gional director objections to the conduct of the election which shall contain "a short statement of the reasons therefor."

The Supreme Court in N. L. R. B. v. A. J. Tower Co., 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322 (1946), noted that "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." We hold that the Board did not unreasonably exercise its discretion in setting aside the first election in the instant proceedings.

The petition of the Board for enforcement of its order is granted.

SCHNACKENBERG, Circuit Judge (dissenting).

In upholding the action of the Board, this court has candidly based its action upon a speech by the company president which is said to have "interfered with the employees' freedom of choice". It also indicates that, but for the speech, a different result might have been reached.

This case is controlled by a principle imbedded in constitutional authority, and recognized by the National Labor Relations Act itself, 29 U.S.C.A. § 158(c), which says:

"The expressing of any views, * * * shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

It is obvious that the president of respondent company had a definite aversion to the recognition of a union in its factory. He had a right to his opinion and a right to state it. That there were those who disagreed with him is evidenced by the repeated efforts to secure the vote of a majority of its employees at a board-controlled election. There was no reason why respondent's president might not state his views to its employees prior to either of the elections. His right to do so existed correlatively

The regulation also requires that the objections be "timely" filed. (29 C.F.R. § 102.69.)

844

with the right of union organizers to present to the employees their views of the benefits of a union. Both sides had the right of fair comment.

The success which the president's arguments met when the employees considered them vis-a-vis with the arguments and contentions of those who argued for the recognition of the union, should not be nullified by the brand of "unfair labor practice". Moreover, I believe that employees, who have listened to the arguments of both sides, should be given a free rein in deciding their own fate, in surroundings which they understand and that their rights should not be tested under "laboratory conditions" in which, it is said, the Board must hold elections.

I would deny enforcement of the Board's order.