**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MALLORY PLASTICS COMPANY, a Division of P. R. Mallory & Co., Inc., Respondent.**

**No. 15174.**

United States Court of Appeals Seventh Circuit.

Jan. 11, 1966.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Solomon I. Hirsch, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcus W. Sisk, Atty., N. L. R. B., Washington, D. C., for petitioner.

Frederic D. Anderson, James F. Hillis, Indianapolis, Ind., for respondent; Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., of counsel.

Before HASTINGS, Chief Judge, CASTLE and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This case is here upon petition of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended (Title 29 U.S.C.A. § 151 et seq.) for enforcement of its order issued against respondent December 11, 1964. The Board's decision and order are reported at 149 NLRB No. 138.

Respondent, Mallory Plastics Company, is a division of P. R. Mallory & Co., Inc., an Indiana corporation with its office and principal place of business at Indianapolis, Indiana. Mallory Plastics Company operates the Chicago plant involved herein, where it manufactures plastic dishware and other plastic ware.

The Board's complaint charged respondent with unfair labor practices in three respects: (a) the discharge of Charles W. Coleman for union activity in violation of § 8(a) (3) of the Act (Title 29 U.S.C.A. § 158(a) (3)); (b) enforcement during an election campaign of a discriminatory solicitation-distribution rule in violation of § 8(a) (1); and (c) coercive conversations between supervisors John Zajac, Leo Paszquiet and Edwin Clark and seven employees, concerning the latters' union activities in violation of § 8(a) (1).

The Trial Examiner found that the discharge of Coleman was not discriminatory. Pursuant to this finding, the Board dismissed this charge. The Board found, contrary to the Examiner, that respondent's solicitation-distribution rule was not discriminatory and this charge was dismissed.

The Board's order and its petition for enforcement are based solely on its finding that conversations between supervisors and employees were in violation of § 8(a) (1), which provides:

"It shall be an unfair labor practice for an employer—(1) to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 157 of this title * * *."

In evaluating the proof relied upon to support a violation of the section just quoted, § 8(c) must be taken into consideration. It provides:

"The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

It is pertinent to note that during the summer of 1963, the union (Textile Workers of America, AFL-CIO) began a campaign to organize the employees at respondent's Chicago plant. Union meet-

ings were held and membership cards were distributed to employees outside the plant's parking lot.

There were conversations, allegedly coercive, between three of respondent's supervisors and seven of its employees. (Respondent had 18 supervisors and some 200 employees.) Three of such conversations were between supervisor Paszquiet and Coleman. Respondent attacks the credibility of Coleman on the basis that much of his testimony on cross-examination was contradictory of that given on direct examination and that the Examiner found that he was discharged for theft rather than discriminatorily. We need not pursue this contention, as we accept the Board's summary of his lengthy testimony. The Board's abbreviated version follows: "Maintenance Foreman Leo Paszquiet had three conversations with Janitor Charles Coleman about the Union. The first conversation was around the middle of August, after Coleman had signed a union card. Paszquiet told Coleman that he had noticed Union representatives outside the plant and asked Coleman what he thought about the Union. Coleman replied that he had not given much thought to the Union. The foreman also remarked that the Union people 'don't mean you any good'. On a second occasion in September, Paszquiet asked Coleman again what he thought of the Union, and Coleman again replied that he had not given it much thought. On November 7, when Coleman reminded Paszquiet that he would be leaving work early that day to attend a conference at the Board's office regarding the forthcoming election, Paszquiet asked Coleman a third time what he thought about the Union. Coleman again gave an evasive answer."

A conversation between supervisor Clark and employee Calvin is summarized in a footnote to the Board's brief as follows: "Shortly after the joint conference on November 7, Assistant Foreman Edwin Clark asked employee Frank Calvin, who was wearing a union button, what he thought of the Union and whether the Union would 'make it or not.' When Calvin replied, 'maybe yes or maybe no,' Clark added that, 'They are not going to do anything for you, maybe a nickel raise.' "

All other conversations were had with supervisor Zajac. Employee Harris testified that Zajac asked him why he was wearing a union button, to which Harris responded that he was for the union. Zajac told Harris that he should know better from experience, as Harris had previously worked at a place where the union was "no good"; that the union, if it got in, would cause the employees' bonus and incentive rates to be taken away; that he was speaking "man to man," and that he was not telling Harris how to vote but that Harris should vote the way he thought best for himself.

Employee Patton testified that Zajac "asked me what I was organizing," said "the union is no good" and "Will you pull the button off?". Patton continued with his work and also continued to wear the button. Patton also testified to a similar conversation which he heard between Zajac and employee Wimms.

Employee Lunsford testified that Zajac after noticing his union button asked him what he thought of the union, to which Lunsford replied that he really did not know because it was his "first dealings with the union." Zajac then related his own experience with unions and expressed the opinion that they were no good. Zajac suggested that if Lunsford did not believe him, he should talk to Harris about unions. Zajac stated, "Well, John, I am talking to you as a friend, not as a foreman. Will you please do me a favor and remove your button before the morning shift comes in so the company won't know who you are for?" Lunsford stated that he could not remove his button because he was "one of the originals that attended the meeting down here at the Labor Relations Board." Zajac then suggested that he would be willing to arrange an appointment for Lunsford with the company president, because he was "very understanding." Lunsford replied that he did not know if he wanted an appointment but that he would let Zajac

know the next morning. Lunsford told Zajac, "Well, I will go along with the majority. If the majority wants to remove their buttons I will remove it. * * I will talk to them and see." That evening after work Lunsford talked with ten other employees in the locker room and they decided that they would continue to wear their buttons. The following day Lunsford told Zajac he had talked with the men and they were not going to take off the buttons, which they all continued to wear.

Employee Taylor was asked by Zajac what he thought about the union button, to which Taylor replied, "I go along with the fellows. They are all wearing them so I am wearing one." Zajac stated that he had previously worked at a place where his salary had been cut $25 or $30 after a union came in, because he could no longer make a bonus. Zajac told him that if the union got in, "You will probably get a dime here or something, but you will lose the bonus." Zajac also told him, "You vote any way you want to, but I hope you vote the right way."

In evaluating these conversations as they relate to interference, restraint or coercion on the part of respondent, it is pertinent to note respondent's background and the environment under which the conversations took place. There is an entire absence of proof of any background of unfairness to the union; in fact, it is disclosed that respondent was tolerant of its employees' rights under the Act. It entered into a stipulation with the union for a consent election, which was subsequently held. Its discharge of Coleman was not discriminatory, as charged, but was for theft, as found by the Examiner. Respondent was exonerated by the Board of the discrimination alleged in connection with its solicitation-distribution rule.

The record discloses without contradiction that respondent enforced a rule by which employees were not to be restrained from discussion of union organization or union activities as long as it did not interfere with the regular hours of work. It was also shown that during the election campaign respondent, upon request, released employees without regard to whether they were engaged in union or non-union activity.

The conversations were between employees and their immediate supervisors, with whom they sustained an intimate and friendly relationship. Coleman stated that he talked with Paszquiet almost every day concerning his family problems. Taylor testified that his talk with Zajac occurred while "we were looking for pre-forms." Zajac talked to Harris, Lunsford and Patton while they were at their machines, as was his custom. The exchange between Calvin and Clark took place while they were going after a drink of water.

It would be futile to cite, much less analyze and discuss, the many cases called to our attention by the parties, purportedly in support of their respective contentions. It is sufficient to distinguish a few of the cases much relied upon by the Board. On the issue as to the asserted discriminatory nature of the interrogations, it cites three decisions of this Court. N. L. R. B. v. Waukesha Lime and Stone Co., Inc., 7 Cir., 343 F.2d 504; N. L. R. B. v. Economy Food Center, Inc., 7 Cir., 333 F.2d 468, and N. L. R. B. v. Bedford-Nugent Corp., 7 Cir., 317 F.2d 861. In these cases the Board's order was enforced, but a comparison of the facts with those here readily discloses they furnish no support for the Board's position in this case. For instance, in Waukesha the Court stated (343 F.2d page 509):

" * * * there was evidence that the company had interrogated its employees, had exercised surveillance over them, had threatened their discharge if they supported the Teamsters, and had declared that it would not contract with that union."

In Economy, there was evidence that the company president stated he would not pay union wages and the company would be sold if the union got in. In Bedford-Nugent, there was evidence that the president of the company called the employees together and told them he would not have

a union, that he would sell first, close down or move.

The Board makes much of the conversations with Zajac relative to the wearing of union buttons. The most we can deduce from these conversations is that Zajac was irritated. His expressions of displeasure, however, were not coercive and contained no threats of reprisal. Certainly they were not so regarded by the employees. Illustrative is the testimony of Lunsford, who told Zajac he would talk to the other employees and see what they thought about wearing the buttons. That evening he did so, and the next morning informed Zajac that he had talked to ten employees and that they had decided they would continue to wear the buttons. The next morning they all showed up for work wearing them.

The cases cited by the Board on this facet of the case are of no benefit to its contention. In Republic Aviation Corp. v. N. L. R. B., 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372, three employees were discharged for wearing union buttons in the plant after being requested to remove them. This was the basis for the holding that the discharges violated the Act.

In N. L. R. B. v. Mayrath Co., 7 Cir., 319 F.2d 424, employees were told that if they wanted to work at the company's plant they had better take off their union buttons. Some of those who refused to do so were told to go to the office and pick up their checks and others were told that they were fired.

In N. L. R. B. v. Power Equipment Co., 6 Cir., 313 F.2d 438, employees came to work wearing bowling shirts upon which were placed an emblem of the union. They were told by a foreman either to (1) take the shirts off immediately, (2) go home and change them and return to work on their own time, or (3) go home, "clocking out," and not return.

The facts in these cases in which enforcement of the Board's order was allowed are far removed from those here. We have read and re-read the evidence and conclude that it does not furnish substantial support for the Board's order, when considered in the light of the entire record. The conversations were not coercive, considered in the environment in which they took place. They were nothing more than expressions of views or opinions which contained "no threat of reprisal or force or promise of benefit."

The petition for enforcement is denied.