**WAUSAU STEEL CORPORATION,**
Petitioner,

v.

The **NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 15840.

United States Court of Appeals
Seventh Circuit.

April 11, 1967.

Schnackenberg, Circuit Judge, dissented in part.

Richard P. Tinkham, of Smith, Puchner, Tinkham & Smith, Wausau, Wis., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Glen M. Bendixsen, Atty., National Labor Relations Board, Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Melvin H. Reifin, Atty., National Labor Relations Board, for respondent.

Before HASTINGS, Chief Judge, and SCHNACKENBERG and KILEY, Circuit Judges.

HASTINGS, Chief Judge.

The Wausau Steel Corporation, a Wisconsin corporation, has petitioned this court to review and set aside an order of the National Labor Relations Board issued against it on August 19, 1966 and reported at 160 NLRB No. 47. The Board has requested enforcement of its order.

The trial examiner found that Wausau violated § 8(a) (1) of the Labor Management Relations Act, 29 U.S.C.A. § 158(a) (1) by promising benefits to its employees and by threatening reprisals and that Wausau violated § 8(a) (5), 29 U.S.C.A. § 158(a) (5) by refusing to bargain in good faith with a majority union. The Board affirmed and generally adopted the report of the trial examiner and ordered Wausau to cease and desist from its unfair labor practice violations and to bargain with the union on request.

Wausau contends that the evidence against it was insufficient to prove that it lacked good faith in refusing to bargain and that the evidence was insufficient to establish that it engaged in unfair labor practices prior to a representation election held at its plant. Wausau urges that even if it did engage in unfair labor practices, it was not precluded by such conduct from asserting a good faith doubt concerning the union's ma-

jority status. It further contends that the union involved, Shopmen's Local Union No. 811, International Association of Bridge, Structural and Ornamental Iron Workers, AFL–CIO, was guilty of misrepresentation or fraud in its card solicitation and electioneering, thus nullifying its claim of bargaining status.

The trial examiner found the following facts. The union received cards from 29 of 38 employees of Wausau authorizing it to act as their bargaining representative. On November 2, 1966, the union wrote Wausau, claiming majority status and requesting recognition. Wausau replied two days later, declining to recognize the union on the ground that the union had supplied no proof of majority status and that Wausau had reason to doubt the union's claim. Shortly thereafter, Wausau and the union agreed to a consent election, which was held on November 22, and which the union lost 21–17.

During the period prior to the election, Theodore Wallach, Wausau's president, communicated with his employees by letters and through speeches. While Wallach was generally guarded in his statements, he did suggest that if the union won the election, overtime work might be reduced or eliminated. He also stated that increased expenses due to unionization might make it necessary to sell trucks, and to close the new steel department, and that if the union obtained a 22 or 22½ cent raise for the employees, Wausau would be forced out of business. He noted that certain wage inequities had come to his attention and that he planned to correct them. He further said:

"No union can supply you with overtime or force the company to provide overtime. Our margin of profit is so small that any substantial increase in our costs would mean that we would operate at a loss and be forced to drop major parts of our operations. We don't want this—and you don't either.

"We intend, when this union matter is settled, to make proper adjustments in wages and to establish a reasonable insurance program."

This theme was stressed a number of times in Wallach's various communications.

Wallach made similar statements to employee Larry Hill, an active union organizer, after summoning Hill to his office and inquiring into any complaints Hill and any other employees had and why they wanted a union.

To Kenneth Thomas, another employee Wallach asked to his office on another occasion, Wallach stated that Thomas, who had been employed only a few months, "might have been here long enough to have received * * * [a] raise with the rest of the men." He further said that if the union won the election, he would have to cut working hours to 40 and hire more employees.

Finally, Wallach stated to another employee, Ronald Martin, that if the union came in, Martin would be one of the first to go, evidently because of a lack of seniority. Wallach repeated his suggestion that if the union came in and expenses were too high, Wausau would shut down operations.

The trial examiner found that Wallach's remarks in his letters and speeches exceeded permissible free speech limits, amounting instead to promises of benefits and threats of reprisals violative of the Labor Management Relations Act.

The trial examiner also found § 8(a) (1) violations in Wallach's interviews with employees Hill and Thomas. The interview with Martin was found to be violative of the Act to the extent that Wallach repeated the promises and threats of his speeches.

The trial examiner concluded that Wausau was also guilty of a § 8(a) (5) violation of the Act, that is, failure to bargain in good faith with a majority union. His principal reason for finding this violation was an application of the rule that where a union has obtained authorization cards from a majority of employees and the employer thereafter engaged in unfair labor practices which

prevented the holding of a fair election, the employer will not be heard to say that he had a good faith doubt of the union's majority.

In addition to a cease and desist order based on the § 8(a) (1) and § 8(a) (5) violations, the trial examiner recommended that Wausau be required to bargain with the union on request.

We find no merit in Wausau's attack upon the union's authorization cards. Wausau introduced evidence tending to show that six authorization cards were solicited through the union's misrepresentations. Even if all six authorization cards were not counted, the union yet had a majority of Wausau's employees who had authorized it to act as their bargaining representative. Such evidence as Wausau did present, when coupled with the fact that no other cards were attacked, did not demonstrate a pervasive misrepresentation by the union sufficient to cast doubt upon the validity of the remaining cards. On this point, Wausau failed to meet its burden of proof, and the Board's judgment has not been shown to be erroneous.

While we do not doubt that Wallach proceeded carefully in attempting to limit his communications to his employees to the legally permissible, his words must be judged by their likely import to his employees. As the trial examiner suggested, one who engages in "brinksmanship" may easily overstep and tumble into the brink. It is well settled that an employer has violated § 8 (a) (1) of the Act if, in communicating to his employees during a union organizational drive preceding an election, he makes promises of benefit or threats of loss or reprisal for their vote. N. L. R. B. v. Realist, Inc., 7 Cir., 328 F.2d 840 (1964), cert. den., 377 U.S. 994, 84 S.Ct. 1921, 12 L.Ed.2d 1046 (1964); N. L. R. B. v. Marsh Supermarkets, Inc., 7 Cir., 327 F.2d 109 (1963), cert. den., 377 U. S. 944, 84 S.Ct. 1351, 12 L.Ed.2d 307 (1964); N. L. R. B. v. Imperial-Eastman Corporation, 7 Cir., 322 F.2d 679 (1963). A fortiori, such promises or threats, directed to specific employees and coupled with interrogation, also violate § 8(a) (1).

We are not convinced, however, that substantial evidence supports the finding of a § 8(a) (5) violation. There is some indication in the record that Wausau may have begun engaging in conduct violative of § 8(a) (1) prior to the union's demand for recognition, but it is not possible to draw from this the sole inference that Wausau had no good faith doubt of the union's majority. It is equally inferable that Wausau was simply concerned and did not like the union organizational drive, perhaps fearing the development of a union majority.

In some cases, a § 8(a) (5) violation could be permissibly inferred from evidence of § 8(a) (1) violations. See Furr's, Inc. v. N. L. R. B., 10 Cir., (No. 8686, 1967); Colson Corporation v. N. L. R. B., 8 Cir., 347 F.2d 128 (1965), cert. den., 382 U.S. 904, 86 S.Ct. 240, 15 L.Ed.2d 157 (1965). However, when evidence of § 8(a) (1) violations cannot be said to be probative of a lack of good faith and, therefore, that bad faith is not, on the record, a reasonable inference, then there is no basis to infer a violation of § 8(a) (5).

Good faith or bad faith is an inference to be drawn from the facts. To some degree, the question of good faith may be a question of credibility. N. L. R. B. v. Economy Food Center, Inc., 7 Cir., 333 F.2d 468 (1964); N. L. R. B. v. Crean, 7 Cir., 326 F.2d 391 (1964). Credibility, of course, is an issue for the trial examiner. In the instant case, however, the trial examiner did not rely upon credibility to find bad faith. He stated:

"* * * the Company contends that the Union never proffered the authorization cards as proof of its majority, and that this circumstance, particularly when coupled with the Union's tender of similar cards on an earlier occasion, led the Company to doubt the Union's claim. This defense might well have been available

had the Company refrained from unfair labor practices, but on this record the Company's illegal conduct precludes its assertion of a good-faith doubt."

The "earlier occasion" the trial examiner referred to relates to the fact that in 1964, the same union involved in this case had attempted to organize Wausau's employees and apparently failed. The union had a number of signed authorization cards, showed them to Wallach and demanded recognition. Nothing came of this, either by way of an election or an unfair labor practice charge, and the union made no subsequent demand. Wallach stated this was because his employees had definitely decided against the union.

This history, through which, no doubt, Wallach viewed the subsequent union attempt to organize his employees, together with the facts that the union failed to show its cards to Wallach, that Wausau readily entered a consent election agreement with the union, and that Wallach was evidently attempting to follow his counsel's advice with respect to what he might permissibly do, more than overweighs an inference from the § 8(a) (1) conduct that Wausau was in bad faith in refusing to recognize the union. We hold the inference of bad faith to be unreasonable from the facts of record taken as a whole.

Although we hold that Wausau did not refuse to bargain in bad faith, we must yet consider an alternative ground asserted by the Board in support of the bargaining order issued in this case. As the trial examiner put it:

" * * * the Company having foreclosed by illegal conduct the customary means of resolving majority, the proof of majority status may be made by cards, and in the light of such proof a bargaining order is appropriate to restore the status existing prior to the violation of Section 8(a) (1), even assuming arguendo that the record did not warrant a finding of unlawful refusal to bargain."

Wausau, citing N. L. R. B. v. Flomatic Corporation, 2 Cir., 347 F.2d 74 (1965), has suggested, assuming that we failed to find it had refused to bargain improperly, that rather than enforce the Board's bargaining order, we require the Board to conduct another election.

There is no doubt that a bargaining order is at times appropriate where a union majority has been dissipated by employer unfair labor practices. In Flomatic, however, it was held by a divided court that a minor or borderline § 8(a) (1) violation which resulted in a moderate unbalancing of an election does not, standing alone, warrant a bargaining order, rather than a new election. Flomatic, supra at 80. In such circumstances, the court stated, a bargaining order may vitiate the freedom of choice guaranteed the employees by the Act by requiring the employees to utilize a minority union as their bargaining representative.

While most recent, Flomatic is not unique in directing the Board to conduct a new election, rather than require the employer to bargain with a union no longer having a majority. In the following cases, the courts have either directed a new election or considered the possibility of doing so and rejected it. N. L. R. B. v. Delight Bakery, Inc., 6 Cir., 353 F.2d 344 (1965); National Labor Rel. Bd. v. Inter-City Advertising Co., 4 Cir., 154 F.2d 244 (1946); Oughton v. National Labor Relations Board, 3 Cir., 118 F.2d 486 (1940); National Labor Relations Board v. P. Lorillard Co., 6 Cir., 117 F.2d 921 (1941), rev'd, 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380 (1942); Hamilton-Brown Shoe Co. v. National Labor R. Board, 8 Cir., 104 F.2d 49 (1939); National Labor Relations Bd. v. National Licorice Co., 2 Cir., 104 F.2d 655 (1939).

In view of the policy of the Act to protect the rights of employees, the concern of appellate courts to protect employees' freedom of choice by assessing the effect of Board orders is not misplaced. An examination of the cases cited, supra, however, readily reveals that appellate

courts have been divided over the appropriateness of refusing to enforce a Board order to bargain and instead directing the Board to conduct a new election.

In those cases in which the Board was directed to conduct a new election, the courts sought and generally relied on record evidence, independent of the election results and untainted by unfair labor practices, which in some way indicated that the union in fact lacked a majority at the time of the bargaining order, and that it was a reasonable inference that the union's lack of majority was not due to the employer's conduct.

On the other hand, in cases in which a bargaining order has been enforced, the evidence has been strong that the union had majority status prior to the unfair labor practice conduct and the representation election, thus strengthening the inference that the unfair conduct was a substantial cause of the union's loss of majority.

In the instant case, the only evidence of majority was the union's authorization cards, and the only evidence of the union's lack of an actual majority was the election result. From the record, it is impossible to say whether the union had an actual majority which the employer's conduct dissipated. Similarly, because of a dearth of evidence, it is not possible to determine the effect of the particular unfair conduct upon the employees' freedom of choice.

Thus, we cannot conclude, as did the court in *Flomatic*, supra, that the § 8(a)(1) violations here were minor or borderline or had only a moderate unbalancing effect upon the election. To so find would be merely to indulge a presumption, unrelated to any record evidence, that the effect of promises and threats in a certain plant was not substantial and that the election influenced by such conduct was nevertheless some indication of the actual sentiment of the employees.

Similarly, a suspicion of the validity of union authorization cards cannot justify the assertion in *this case* that the union, while having a card majority, was unlikely to have had a real majority. The union's card majority, not discredited at the unfair labor practice hearing, is the only unblemished record fact relating to the union's actual majority.

There is no evidence upon which to base a conclusion impugning the Board's inference that Wallach's unfair conduct dissipated an actual union majority. Cf. National Labor Rel. Bd. v. Stow Manufacturing Co., 2 Cir., 217 F. 2d 900 (1954), cert. den., 348 U.S. 964, 75 S.Ct. 524, 99 L.Ed. 751 (1955). Assuming, without deciding, that we have the authority under certain circumstances to order the Board to direct a new election we do not find this case appropriate for such an order.

We cannot say where the evidence does not disclose the inappropriateness of the Board's bargaining order that the Board has exceeded the statutory discretion given it. To devise appropriate remedies and to gauge when the labor atmosphere has been cleared so that a new election may be held are within the Board's discretion. Franks Bros. Co. v. National Labor Relations Board, 321 U.S. 702, 64 S.Ct. 817, 88 L. Ed. 1020 (1944); Intern. Ass'n of Mach. etc. v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50 (1940); Delight Bakery, supra; Stow Manufacturing Co., supra; Oughton, supra.

For the foregoing reasons the petition to set aside the order of the Board under review in this case is denied the cross-petition of the Board for enforcement of its order is granted, and an appropriate decree shall issue.

Review denied and enforcement ordered.

SCHNACKENBERG, Circuit Judge.

As to the charge of a violation of § 8 (a) (5), I concur with Judge Hastings' holding that such violation is not supported by any inference. However, I dissent as follows:

The board found that petitioner violated § 8(a) (1) of the act by promising

benefits to its employees to induce them to oppose unionization, by threatening reprisals in the event of unionization, and by coercively interrogating its employees. The board further found that petitioner violated § 8(a) (5) and (1) of the act by refusing to bargain with the union, which claimed to have been designated as exclusive collective bargaining representative by a majority of petitioner's production and maintenance employees.

There was evidence before the board tending to prove the following, *inter alia*:

Beginning in October 1965, the union commenced an organizational drive at petitioner's plant and caused the distribution of authorization cards among its workers. Each card was captioned "Authorization for Representation". The union claimed that 29 of the 38 employees had executed such cards. The union by letter dated November 2, 1965 informed petitioner that it represented a majority of production and maintenance employees, and requested recognition. Petitioner's president, Theodore Wallach, wrote the union stating that, inasmuch as the union had not submitted proof of its claimed majority status and since the petitioner had reason to doubt the accuracy of this claim, petitioner would not recognize the union as bargaining representative. On November 2, 1965 the union sent to the board a petition for an election, which was held November 22, 1965, resulting in defeat of the union by a vote of 21 to 17. Thereupon the union filed unfair labor practice charges against petitioner, alleging improper and unfair labor practices prior to the election, and stated that the union represented a majority of the employees, asking that the election be set aside and that the union be designated as bargaining agent for the employees. The case was heard by a trial examiner who concluded that petitioner had violated § 8(a) (5), § 8(a) (1), and § 2(6) and (7) of the act, that the election should be set aside, and that petitioner should be ordered to bargain with the union.

The board affirmed and adopted the actions and proposed order of the examiner, with unimportant exceptions, and the matter is now before us on the petition for review and the board's cross-petition for enforcement of its order.

A careful examination of all of the oral statements and written letters of Wallach [1] convincingly shows that they

---

1. Petitioner introduced "Company's Exhibit 1", which is a transcript of a speech made by Wallach to the employees on November 3, 1965:

Fellows. Again we are assembled for an important reason. We understand that there is talk getting a Union in our organization. Personally I do not see, why we need some strangers, to act as our in between messengers. The Company is small enough, to have the individuals approach me or Fred or Peter to discuss any differences.

By the way there are a number of inequities, which we discovered, when this morning we compared wages, which will be corrected very quickly. I am sorry for this, I never took the time, to check up on it and our girls never ever made mention of any of these underpay wages, if you please.

If besides the inequities, mentioned before, I have been amiss of anything, tell me so. You certainly aren't afraid to communicate with me. I came to the States 28 years ago as a refugee and surely am not any different from all of you. We were discussing a plan, which we were to submit to you for the last 2 weeks, not knowing of any Union difficulties. However we cannot divulge it now, because it might be considered a violation of the N. L. R. B. regulations, as a coercion.

Now coming back to the union setup. Where do you think, you can improve yourself? In a large enterprise a union may help. Here with our peculiar setup I can't see any advantages to either party but certain disadvantages to both. If the expenses get too high, we have to abandon all the overtime and employ more men. In our case, with no particular expert professions it can easily be done. We always encouraged all of our employees, to work as much overtime as they wanted, even begged for it to

do not constitute a violation of § 8(a) (1) of the act. Instead they are a legiti- mate exercise of the right of free speech and a permissible attempt at reasonable

compensate for and increase their wages. Because I take chances that ordinarily are not taken by other scrap and steel and secondary dealers and use my good reputation for loans, we have a decent setup. You can see light in my office 5–6 evenings a week up to 11–12 p.m. Sat. afternoons and evenings and Sunday afternoons and evenings to keep the organization smooth and on an even keel.

You realize that we buy 90% plus at wholesale prices, which allows an extremely small profit and we therefore are a low profit company with certain limits, but that additional substantial business also allows us, to employ as many men as we do and also not to send anybody home for lack of work or because weather conditions make it unprofitable, to hold our men, even if they cause a loss during those extended periods particularly in wintertime.

To save substantial additional expenses we would have to change the present setup, reduce certain transactions, which now are barely practical from a profit standpoint and then would become a losing movement. We must try, to defend ourselves, to maintain the operation and believe me, it is not as easy, as it looks from the outside. I kid you not. You are grownups, with ability to think for themselves. Some of the men do not realize how good they have it and a change is by no means necessarily to the better.

One rumor has it, that a time card has been pulled because said employee was 10 mts. late. The employee is still here, whether he was ever 10 mts. late I do not know but nobody—I repeat nobody mentioned anything to him nor does anybody, who has the right to fire know of any incident of that kind. It is a malicious rumor planted by somebody, who wants to fish in the dark. Also another rumor speculates that one of our employees is going to be fired. Upon asking around, I can say in good conscience, that there is nothing whatsoever to it and that it probably comes from the same rumor mill as the first unfounded story.

I would appreciate your comment now, if possible, but before we discuss matters I want to read you a letter which each one of you will receive at home tomorrow morning.

General Counsel for the board introduced Exhibit # 5, a letter, read by Wallach to the employees and mailed by him to said employees, reading as follows:

(Letterhead of Wausau Steel Corporation,
Wausau, Wisconsin 54402.)

November 3, 1965

Dear Fellow Employee of Wausau Steel Corporation:

We have been advised that Iron Workers Local 811 has been attempting to organize the employees of this company and to become our employees' exclusive bargaining representative and agent. We have not been shown any union membership or authorization cards signed by any of our employees and therefore we do not know whether any of you have or have not signed such cards as of this time.

The purpose of this letter is to acquaint you with your rights as employees. If there has been any pressure put upon you by the union representatives or if you have been embarrassed by this situation, we are sorry indeed.

You do not have to talk to anyone about unions or for or against unions if you don't want to. No one can make you join a union. No one can make you sign a union authorization card or a union membership card. If you have already signed such a card, you can ask that it be torn up or returned to you. If you signed such a card and do not want it to be in force, you may either tell the union agent that or inform our office of that fact so that we will know of your wishes and can be guided accordingly.

The laws of this country guarantee each one of you the right to join or not to join a union. It is for you to decide whether you want to or do not want to have a union in our business.

If an election is held at any time in the future concerning union representation, you are free to vote "Yes" or "No" as you choose regardless of whether or not you have prior to the election signed or not signed a union

persuasion exercised on behalf of the management of a business. Actually all that Wallach did in his letters, talks and conferences, was to advise the employees,

you to do anything you don't want to do or to threaten you in any way in authorization or membership card. No one has the right to force or coerce this type of situation.

The Company has tried to be fair with its employees, both as to working conditions and wages. As you know, our employees have received a great deal of overtime pay and their total takehome pay we believe to be very satisfactory to our employees. We would hate to have to reduce or eliminate such overtime pay. We think our employees and the company are getting along together very well and we hope a third party such as a union is not placed between us and our employees and the fine relationships we have enjoyed in the past. If you have any questions about this letter or anything you would like to talk over with me, my office door is always open to any and every employee.

Yours very truly,<br>WAUSAU STEEL CORPORATION,<br>By Theodore Wallach,<br>*President.*

On November 16, 1965, the union circulated among petitioner's employees the following notice, introduced as "Company's Exhibit No. 2":

Wausau Steel Corp.
Employees
*HOW MUCH LONGER?*
*WILL YOU*
be dominated by your employer?
*WHEN*
will you stand on your own feet?
*THE LABOR MANAGEMENT RELATIONS ACT*
*GUARANTEE YOU THE RIGHT TO ORGANIZE AND TO CHOOSE YOUR OWN REPRESENTATIVES.*
*WHY ARE YOU AFRAID:*
to use the law that organized labor helped to pass thru Congress for the benefit of all labor.
*ATTEND:*
*YOUR* Meeting, Thursday, November 18, 1965 at 7:30 P.M. *LABOR TEMPLE*, So. 3rd Ave. *SHOPMEN'S LOCAL UNION* #811 of the *INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL*, and *ORNAMENTAL IRON WORKERS, A.F. OF L.*
*IT ALWAYS HAPPENS.*

When you start talking *UNION* the *"BOSS"* wakes up from his deep sleep much like a bear does in the spring sunlight. He sniffs the breeze and doesn't like what he sees.

He is a wise *"OLD BEAR"* and instead of howling and scratching he uses a nice bouquet of flowers to sweeten things up.

Ha: He will tell you, how silly of you thinking about a UNION. You don't need a UNION to represent you. It is a waste of money, you can do better without one. How many times have you heard this story? Did you ever ask the boss why he uses a "WAUSAU LAWYER" TO REPRESENT HIM OR SAYS THAT THE UNION WOULD SEND THE COMPANY INTO BANKRUPTCY, BUT HE DOES NOT MENTION THE TREMENDOUS PROFITS HE MADE LAST YEAR. IT IS SIMPLE, *HE NEEDS* THEIR REPRESENTATION AND PROTECTION THE SAME AS *YOU* NEED YOUR SHOPMEN'S LOCAL UNION NO. 811.

Many rumors are deliberately started in the shop to get you to reconsider. Then, when it is too late, the Boss just smiles for you and tells you it was just a rumor.

Beware that you are not deceived by this double talk. Why aren't your wages in line with other union shops? Why do you have to pay the hospital and welfare plan for you and your family? Why do you have to pay the life insurance[?] Why is it that you do not [have] a grievance procedure plus representation to properly process your grievances for you?

and his advice is properly summarized in petitioner's brief:

"* * * *if* the Union comes in and causes an increase in wages and other expenses, because of the Company's small margin of profit it will then *be necessary* to cut costs by reducing overtime hours, and eliminating unprofitable and marginal operations. We plan to adjust the wage inequities

> The boss knows that when you are represented by your shopmen's local union no. 811 things will be different.
>
> It is simple, the Boss is only human, with selfish interests, when deals with you separately, you can take what he offers * * * or * * * be kicked out * * * or * * * quit, its up to you. When he deals with you collectively, represented by your shopmen's local UNION NO. 811 it is a horse of another color. It is no wonder that the boss wakes up when the sun starts shining in his face, he is not so dumb. He will promise you anything to keep you from voting *YES* on Nov. 22th. [sic]
>
> You watch that bear *lest* he *devour* you.
>
> The boss knows what your *UNION* can do for you. He knows that your union will provide you with job security, company paid life insurance and hospital insurance. He knows that with your union representing you things will be different.
>
> You do not need anyone telling you how to vote. We know that you have considered these things and will vote *YES*.
>
> Continue to support your shopmen's Local Union No. 811 it is *MONEY IN YOUR POCKET*.
>
> This is your *ELECTION TO WIN*.
>
> Your shopmen's local Union No. 811 organizing committee.

On November 18, 1965, Wallach read to the employees and mailed to their homes the following letter, introduced as "General Counsel's Exhibit No. 7":

(Letterhead of Wausau Steel Corporation,
Wausau, Wisconsin 54402.)

November 18, 1965

Dear Fellow Employees of Wausau Steel Corporation:

As you know, there will be an election conducted by the National Labor Relations Board at our plant Monday morning, November 22, 1965, between 9:15 and 10:00 o'clock a.m. in the lunch room. This will be a secret ballot with a secret polling booth provided where each plant employee will have a chance to vote "Yes" or "No" as to union representation.

We urge each employee eligible to vote to exercise his right to vote. Any employee who does not vote his own belief and his own conscience will have no grounds for complaint later concerning the outcome and, in effect, will be helping the group whose views he does not share.

This is a secret ballot. No one can or will know how any employee votes. It makes no difference whether you have or have not signed a union authorization or membership card, whether you have joined or not joined a union, or whether you have or have not paid any initiation fee to a union. You can vote as you wish regardless of anything that has gone before.

The union cannot provide you with high wages, job security and insurance benefits. Only a sound company engaged in a prospering and continuing business can do that. No union can supply you with overtime or force the company to provide overtime. Our margin of profit is so small that any substantial increase in our costs would mean that we would operate at a loss and be forced to drop major parts of our operation. We don't want this—and you don't either.

We intend, when this union matter is settled, to make proper adjustments in wages and to establish a reasonable insurance program.

It is easy for a union organizer to promise the moon—and when he finds he can't deliver, to tell you to strike. But he keeps on getting paid—you don't! We don't want this—and you don't either.

If you agree with us that the best thing for you and for the company is to continue as we have in the past, if you believe it is best that you be able to represent yourself and to talk to us and we to you directly, if you believe

which we have discovered, and discuss an additional insurance plan with you after the election, regardless of how it comes out, but cannot discuss that now. We would prefer to deal directly with our employees without going through a Union but it is your free choice to make."

Undoubtedly Congress had such a situation in mind when it enacted 29 U.S.C. § 158(c), which provides:

"The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

Although the board in its brief relies on N. L. R. B. v. Economy Food Center, Inc., 7 Cir., 333 F.2d 468 (1964) in support of its contention that it has consistently been recognized that such statements by management carry an implied threat of reprisal if the employees opt for collective representation, and "instill in the employees a fear of economic loss * * *", that case was distinguished by us in 1966 in N. L. R. B. v. Mallory Plastics Company, 7 Cir., 355 F.2d 509, where, in a learned opinion by Senior Judge Major, we said, at 512:

"* * * a comparison of the facts with those here readily discloses they furnish no support for the Board's position in this case. * * * In Economy, there was evidence that the company president stated he would not pay union wages and the company would be sold if the union got in. * * *"

At page 513, Judge Major added:

"* * * We have read and re-read the evidence and conclude that it does not furnish substantial support for the Board's order, when considered in the light of the entire record. The conversations were not coercive, considered in the environment in which they took place. They were nothing more than expressions of views or opinions which contained 'no threat of reprisal or force or promise of benefit.'"

In finding against petitioner on the alleged violation of § 8(a)(1) the board also relies on Wallach's conversations with employees Larry Hill, Kenneth Thomas and Ronald Martin. On November 6, Wallach asked Hill what the complaints of the men were, and why they

that we are trying to be fair with you in your total take-home pay—then we urge you to vote "No."

Yours very truly,
WAUSAU STEEL CORPORATION,
By Theodore Wallach,

*President.*

On December 9, 1965, petitioner mailed a letter (introduced as "General Counsel's Exhibit No. 8") to its employees, telling them:

(Letterhead of Wausau Steel Corporation,
Wausau, Wisconsin 54402.)

December 9, 1965

Dear fellow employee of the Wausau Steel Corporation:

We have previously advised our employees that we would investigate the possibilities of an insurance program covering our employees and advise them of the results as soon as possible.

We commenced such investigations in early October 1965, several weeks before we learned that the union was solicitating [sic] among our employees. We have continued these investigations. Unfortunately, we are advised that it would be improper for us, to disclose that plan or put it into effect. while the charges growing out of the election are pending.

As soon as these charges are disposed of, we will be in touch with our employees concerning an insurance program.

WAUSAU STEEL CORPORATION,
Theo. Wallach,
*President.*

wanted a union. On that occasion Wallach also said, in response to Hill's statement that they wanted a retirement plan, that the company had been looking into insurance, but could make no promises. Finally, before the trial examiner, Hill testified that Wallach had

> " * * * told me that about something about 22 cents or 22½ cents, whatever it is, if he, you know, had to raise that much that certain parts would have to be slowed down or cut out or something."

On November 20, Wallach asked Thomas to come to his office. Thomas testified before said examiner that Wallach said he would have to hire more men, and there would be fewer hours of work for the men if petitioner's expenses (wages, etc.) went up. According to Thomas, Wallach also said that

> " * * * some of the men have raises coming to them that were working there before and those that had just started will have raises also."

On that same day, November 20, Martin, pursuant to a telephone call from his mother, went to petitioner's office. After he had finished his telephone conversation, Wallach told him that he (Martin) did not have as much seniority as those who had worked at the plant longer, and that he (Martin) would be "one of the first ones to go."

Even if, contrary to the facts, the foregoing conversations could possibly be regarded as violations of § 8(a) (1), they are minimal and would not warrant an order to bargain. Rather, the remedy then would be a new election. N. L. R. B. v. Flomatic Corporation, 2 Cir., 347 F.2d 74 (1965).[2]

For the foregoing reasons, I would deny enforcement of the order of the board and set aside the order.

---

2. A subsequent opinion of the Second Circuit, Irving Air Chute Company v. N. L. R. B., 350 F.2d 176, 182 (1965), distinguished *Flomatic* on the ground that in the latter "there was only a minimal § 8(a) (1) violation and no demand and refusal to bargain." In the case at bar, however, petitioner's refusal to bargain was based on a "good faith" doubt as to the union's alleged majority status, and, thus, such a "refusal to bargain" was justified. Moreover, the minimal 8(a) (1) violations, if in fact they exist, would not bar petitioner from asserting a good faith doubt.